OPINION
 

 HAROLD A. ACKERMAN, District Judge.
 

 I. INTRODUCTION
 

 This is a suit to recover pension and employee welfare benefits brought pursuant to the Employee Retirement Income Security Act of 1974 (“ERISA”), 29 U.S.C. § 1001
 
 et seq.
 
 The fourteen plaintiffs are all former salaried employees of the Dutch Boy Paint Division (“Dutch Boy”) of NL Industries (“NL”) not covered by a collective bargaining agreement.
 
 [1]
 
 They allege that as a result of the sale of Dutch Boy to ELT, Inc. (“ELT”) in December 1976, NL terminated their employment and wrongfully deprived them of certain employee benefits in violation of the provisions of ERISA. Both NL and the Employee Benefit and Retirement Plan of NL Industries, Inc. are named defendants. The case is presently before me on the defendants’ motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) on all counts of the complaint.
 

 Under Rule 56(c), summary judgment may be granted only if there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. In considering such a motion, I must view the evidence in a light most favorable to the party opposing the motion, drawing every reasonable inference in his or her favor.
 
 Small v. Seldows Stationery,
 
 617 F.2d 992, 994 (3d Cir. 1980).
 

 With that standard in mind, I have considered the pleadings, affidavits and answers to interrogatories submitted by both sides and have concluded that the defendants are entitled to partial summary judgment. The complaint, which is set out in eight counts, can be summarized briefly as follows:
 

 First Count: Claim for separation pay from NL
 

 Second Count: Claim for vacation pay in lieu of vacation time
 

 Third Count: Claim for ancillary pension benefits including early retirement benefits, Health and Life Insurance Continuation benefits, and a Level Income Option
 

 Fourth Count: Claim for “Rule of 80” supplemental payments
 

 
 *1354
 
 Fifth Count: Claim that NL failed to prepare or inadequately prepared benefit plan descriptions
 

 Sixth Count: Claim for benefits under the 1976 NL Employee Stock Ownership Plan (“ESOP”)
 

 Seventh Count: Claim for immediate vesting in employee benefit plans on account of an alleged partial termination of the plans
 

 Eighth Count: Claim of discriminatory crediting of periods of service.
 

 For reasons detailed below, I have decided to grant summary judgment to the defendants on the Third, Fourth, Sixth, Seventh and Eighth Counts. Because there are material issues of fact in dispute, I have denied the defendants’ motion on the First Count, except as to certain retired plaintiffs, the Second Count, and the Fifth Count.
 

 II. FACTS
 

 The affidavits and other documentary evidence, viewed most favorably to the plaintiffs, reveal the following facts:
 

 On December 28, 1976, NL sold Dutch Boy to ELT as a going concern. The transfer of Dutch Boy took about three months to complete after this date. In order to encourage the Dutch Boy employees to stay on in their positions, NL arranged for guaranteed employment with ELT at the same salary and seniority in lieu of severance benefits and vacation pay accrued in 1976.
 

 All Dutch Boy employees who were at least 55 years of age or would reach age 55 within three months of the sale date were offered early retirement at reduced benefits pursuant to § 4.3(b) of the NL Industries, Inc. Retirement Plan for Salaried Employees in the United States Not Covered by a Collective Bargaining Agreement, Amended January 1,1974 (“1974 Plan”) (App. I, § 3).
 
 [2]
 
 Section 4.3(b) of the 1974 Plan provided for early retirement to employees within 10 years preceding age 65 “at the convenience of the company”. This early retirement option (hereafter referred to as Age 55 Retirement) was offered to all Dutch Boy employees meeting the age requirement at the time of the divestiture regardless of their length of service with NL.
 

 Those early retirees whose age and length of service equalled 80 at the time of the retirement were given monetary supplements known as “Rule of 80” benefits. All of the age 55 retirees were entitled to continuation of Health and Life Insurance coverage under the express terms of those plans.
 

 The Dutch Boy employees who were under 55 years of age at the time of the sale were terminated from NL employment. Owing to inadequate length of service, some of the terminated employees were not vested in their accrued benefits, and thus stood to lose all of their accrued pension benefits. To avoid this harsh result, NL agreed to credit these employees with future service at ELT for vesting purposes only.
 

 Sometime in 1977, the NL pension plan was amended to comply with the requirements of ERISA. I will refer to this version as the “1976 Plan” because, although it was not adopted until August 29, 1977, it was made applicable retroactively to January 1, 1976. One change in the pension plan, significant to this case, involved Age 55 Retirement. Under the 1976 Plan, the discretion of the company to grant such retirement was sharply curtailed and limited to recommending retirement when a “Participant is unable to perform his duties with the degree of efficiency necessary to meet the work standards of the Employer, whether due to poor health or some other condition beyond his control.” 1976 Plan § 5.3(b) (App. I, § 1). The company’s recommendation then has to be reviewed by the Pension and Employee Benefits Committee.
 

 By the time this lawsuit was filed on August 22, 1980, all of the plaintiffs were vested in their accrued pension benefits as defined by ERISA, 29 U.S.C. § 1002(23)(A),
 
 *1355
 
 and they will all be eligible to receive their accrued pension benefits at age 65. In addition, those plaintiffs with 20 years of service will be eligible to receive actuarially reduced benefits at age 60.
 
 See
 
 1976 Plan, § 6.4 (App. I, § 1). However, as a result of the Dutch Boy divestiture and consequent termination from NL employment, the plaintiffs, under age 55 at the time of the divestiture, lost their Health and Life Insurance coverage and certain other ancillary benefits reserved to employees retiring from active employment with NL. The plaintiffs are challenging the loss of these benefits as well as the denial of severance and vacation pay. The basis of their challenge is ERISA.
 

 III. ANALYSIS
 

 ERISA, the Employee Retirement Income Security Act of 1974, is a comprehensive remedial statute designed to cure widespread weaknesses perceived in the private pension system. To strengthen the pension system, ERISA established minimum vesting, funding, fiduciary, and disclosure requirements which every plan must meet in order to qualify for tax benefits. It also delineated a specific uniform standard of conduct for fiduciaries, including a list of proscriptions which represent the most serious types of fiduciary misconduct.
 
 See generally
 
 Introductory Remarks of Senator Harrison A. Williams to S.4
 
 reprinted in
 
 Senate Subcommittee on Labor, 94th Cong., 2d Sess., Legislative History of the Employee Retirement Income Security Act of 1974, (Comm. Print 1976).
 

 Employee welfare benefit plans, such as health insurance plans, are also covered by ERISA. 29 U.S.C. § 1002(1). Although there are no minimum requirements as to the form and content of such plans, they are governed by the disclosure and fiduciary conduct provisions. ERISA also gives participants and beneficiaries of welfare benefit and pension plans the right to sue for the benefits under the plans in federal court.
 

 A. SEVERANCE PAY
 

 In their First Count the plaintiffs seek severance pay. They claim that when NL sold Dutch Boy to ELT, they were terminated as NL employees and therefore were entitled to a severance allowance under NL’s severance plan. They argue that NL’s severance plan is an “employee welfare benefit plan” within the meaning of 29 U.S.C. § 1002(1) and that NL’s denial of severance pay violated the provisions of ERISA. If the severance plan is a “welfare benefit plan”, then it is subject to the ERI-SA standards of fiduciary conduct. In addition, this court would have jurisdiction over the claim. NL contends that the so-called “severance plan” is not governed by ERISA and in any event, is couched in such discretionary language that it does not create any entitlement in the plaintiffs.
 

 ERISA broadly defines “employee welfare benefit plan” to include:
 

 “Any plan, fund, or program which was .. . established or maintained by an employer ... to the extent that such plan was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) . . . unemployment, or vacation benefits, ... or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).”
 

 29 U.S.C. § 1002(1).
 

 Subsection (A) refers to “unemployment” benefits. Severance pay, which in general is intended to tide an employee over while seeking a new job, certainly could be considered an “unemployment” benefit. In addition, § 186(c),
 
 [3]
 
 cited in subsection (B), explicitly mentions “severance benefits”. According to Department of Labor regulations, the effect of citing to § 186(c) is “to include within the definition of ‘welfare
 
 *1356
 
 plan’ those plans that provide holiday and severance benefits, and benefits which are similar ...” 29 C.F.R. § 2501.3-1.
 

 It appears, therefore, that under subsection (A) or (B) of § 1002(1), Congress intended the term “welfare plan” to include a plan for severance benefits.
 
 See Pinto v. Zenith Radio Corp.,
 
 480 F.Supp. 361 (N.D. 111.1979). Indeed, this conclusion is bolstered by a statement of the Department of Labor. In promulgating a proposed amendment to 29 C.F.R. § 2510.3-2(b), excluding severance pay plans in certain circumstances from the definition of pension plans, the Department of Labor stated:
 

 ... since the provision of severance pay is one of the recognized purposes for a welfare plan under section 3(1) [29 U.S.C. § 1002(1)] it would seem that severance pay plans would
 
 in virtually all cases be welfare plans,
 
 whether or not they are also pension plans for the purposes of Title I of ERISA. (Emphasis added).
 

 44 Fed.Reg. 11763 (1979).
 

 The defendant contends, however, that it had no plan — just an internal policy statement that allowed severance pay as a purely discretionary matter “to provide the employee with financial resources while unemployed and seeking other employment.” Employee Relations Policy — Separation Allowance (App. I, § 15). Neither Congress nor the Department of Labor has been very specific about what constitutes a “plan, fund or program” for purposes of § 1002. However, since NL’s policy statement provides for varying separation allowances based upon length of service and standards for granting such allowances, it constitutes a “plan” in my judgment. I agree with the defendants that the plain language of the plan, which is couched in discretionary terms, does not grant the plaintiffs any entitlement to severance pay.
 
 [4]
 
 However, the conduct of the defendant in administering the plan may have entitled them to severance pay.
 

 The plaintiffs have submitted the affidavits of Miles A. Stout, Central Regional Manager of Dutch Boy Paint when it was still owned by NL, and Dominic J. Petrella, one of the plaintiffs who had been employed by NL in its Dutch Boy division from February 15, 1953 until December 1976.
 

 These affidavits, when viewed in a light most favorable to the plaintiffs, support a finding that NL, in practice, gave every previously terminated employee severance benefits in accordance with his or her length of service as a form of farewell bonus. In addition, it can be inferred from these affidavits that NL used its benefit programs, including severance pay, to induce prospective employees to join the company. Thus, when the facts are viewed generously in favor of plaintiffs, it appears that NL had a severance plan that entitled its employees to benefits based on length of service. Although NL argues that these employees were not entitled to such benefits because they were never unemployed, there is evidence that severance benefits were not tied to actual unemployment.
 
 See
 
 Affidavit of Miles A. Stout ¶ 4, filed July 29, 1981.
 

 NL further argues that because it arranged for substitute employment for the plaintiffs, it discharged its obligation, if any, under the severance plan. It contends that the Dutch Boy divestiture was unique because it was the only situation under which continued employment was guaranteed.
 
 See
 
 Affidavit of Richard M. Cox, Manager of Internal Staffing for NL Industries, Inc., filed October 23, 1981. Nothing in the plaintiffs’ affidavits contests this assertion. Nonetheless, summary judgment is not appropriate at this time. If the NL plan, as implemented, entitled employees to severance pay upon discharge, then in my
 
 *1357
 
 judgment as a matter of law, the plaintiffs should have been given a choice between severance pay and guaranteed employment with ELT. Since it is a disputed question of fact just what the plan entitled the plaintiffs to, if anything, I shall deny defendant’s motion for summary judgment on the First Count, as it applies to the plaintiffs who were discharged from NL.
 

 There are several plaintiffs, however, who were retired, not discharged, from NL at the time of the Dutch Boy divestiture. These plaintiffs are John Harrower, Barbara Munro and James Raber. While these plaintiffs were also denied severance benefits, there is
 
 no
 
 evidence that NL ever granted severance benefits to retiring personnel. In addition, the plain language of the policy statement declares: “No allowance will be granted in the case of resignations, retirements, or discharges for violations of Company rules .... ” Employee Relations Policy — Separation Allowance, P-34, 1, (App. I, § 15.) Thus, even reading the evidence most favorably to the plaintiffs, I find that those plaintiffs who were granted early retirement at the time of the divestiture were not entitled to severance benefits. Accordingly, I will grant summary judgment on the First Count to the defendants as to the claims of John Harrower, Barbara Munro, and James R. Raber.
 

 B. VACATION PAYMENTS
 

 In the Second Count, the plaintiffs seek payment in lieu of vacation time earned in 1976. It is undisputed that the plaintiffs were denied vacation payments at the time of the divestiture of Dutch Boy. Instead, as part of the agreement with ELT for guaranteed employment, NL arranged for ELT to grant the plaintiffs the same vacation benefits they would have enjoyed had their employment with NL continued. Moreover, it is undisputed that all of the plaintiffs accepted these vacation benefits.
 

 As with severance benefits, the vacation benefits plan is embodied in an internal unpublished policy statement. The defendants argue that ERISA, as interpreted by 29 C.F.R. § 2510.3-l(b)(3)(i), clearly is inapplicable. That section states:
 

 Payroll Practices.
 
 For purposes of Title I of the Act and this chapter, the terms “employee welfare benefit plan” and “welfare plan” shall not include ... (3) Payment of compensation out of the employer’s general assets, on account of periods of time during which the employee, although physically and mentally able to perform his or her duties and not absent for medical reasons .. . performs no duties; for example — (i) Payment of compensation while an employee is on vacation or absent on a holiday, . ..
 

 The plaintiffs argue that this regulation violates ERISA. However, I need not reach that issue because plaintiffs’ claim survives on common law grounds. In contract terms, the creation of the vacation plan constitutes an offer of a unilateral contract by NL to its employees. By performing the conditions of the offer, the employees accept the offer and the unilateral contract is formed.
 
 See Matter of M & M Transportation Co.
 
 3 B.R. 722 (D.C.S.D. N.Y.1980);
 
 Hardy v. H.K. Porter Co.,
 
 417 F.Supp. 1175, 1183 (E.D.Pa.)
 
 aff’d. in part rev’d. in part,
 
 562 F.2d 42 (3d Cir. 1976). The vacation plan provides in pertinent part:
 

 Separation
 

 Each employee will receive pay for vacation accrued on the previous December 31 but not taken during the current year.
 

 Employee Relations Policy — vacations (App. I, § 16).
 

 The plaintiffs were separated from NL at the time of the sale. The defendant argues that since Dutch Boy was sold on December 28, and vacation does not accrue until December 31, the plaintiffs were not entitled to any vacation pay. However, the Stout and Petrella affidavits, when read in a light most favorable to the plaintiffs, indicate that regardless of when a termination occurred, the Company treated vacation time as accrued and granted a discharged employee payments in lieu of vacation time. Therefore, by its conduct the
 
 *1358
 
 Company may have created an entitlement to vacation pay.
 

 It is well established that a party is bound according to the meaning that he “induces another to understand and act upon, if he knows or has reason to know that the other will so understand and act.” Corbin on Contracts, § 538
 
 quoted in George M. Brewster & Son vs. Catalytic Construction Co.
 
 17 N.J. 20, 28, 109 A.2d 805 (1954). The plaintiffs’ affidavits indicate that vacation pay, tied to length of service, was one of the benefits used to induce them to work for NL and to continue working for NL.
 

 The defendants argue, however, that by obtaining guaranteed employment for the plaintiffs with ELT at the same salaries and seniority and with the same vacation schedule, it discharged its obligation, if any, to give the plaintiffs payments in lieu of vacation time. I am not persuaded. Although it is undisputed that the plaintiffs ended up with the same vacations they would have had as NL employees, that is not the issue. In contract terms, if NL made a unilateral offer to pay the plaintiffs for any earned vacation time upon separation from the company, then the plaintiffs were entitled to these payments, and not substituted vacation time with ELT. At the very least, for summary purposes, as with the severance benefits, the plaintiffs were entitled to a choice. Indeed, it is conceivable that they are entitled to both. Accordingly, I am denying the defendants’ motion for summary judgment on the Second Count of the complaint. Although this count might not be covered by ERISA, I would have jurisdiction over it as a pendent state law claim. This claim and the federal ERISA claims arise out of a common nucleus of operative fact.
 
 See United Mine Workers v. Gibbs,
 
 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966);
 
 Lentino v. Fringe Employee Plans, Inc.,
 
 611 F.2d 474, 478 (3d Cir. 1979).
 

 C. PENSION BENEFITS
 

 In the Third and Fourth Counts of the complaint, the plaintiffs seek certain pension benefits available to participants in the NL pension plan who retire from active service with NL. As previously mentioned, the 1974 Plan was in effect at the time of the Dutch Boy divestment. After the divestment, the Plan was amended and the amended version, the 1976 Plan, was made effective retroactively to January 1, 1976. Both versions of the Plan are “defined benefit” plans. See 29 U.S.C. § 1002(34). It is undisputed that the plaintiffs are
 
 not
 
 entitled to the benefits they are seeking under the express terms of either version of the Plan. These benefits which are only available to employees retiring from active service with NL can be briefly described as follows:
 

 1) Age 55 Retirement: Early retirement at reduced benefits granted to employees within 10 years of normal retirement, which is age 65. Under the 1974 Plan, this benefit was granted at the convenience of the company. 1974 Plan § 4.3(b), (App. I, § 3). Under the 1976 Plan early retirement could only be granted when an employee was no longer capable of performing his or her duties “with the degree of efficiency necessary to meet the work standards of the employer.” 1976 Plan § 5.3(b) (App.I, § 1).
 

 2) Rule of 80 Benefits — a monetary supplement paid to retirees whose age and length of service equals 80. The supplements continue until the retiree reaches age 65.
 

 3) 60/30 Retirement — early retirement at age 60 with full benefits granted to those who have 30 years of service with NL. 1974 Plan § 4.2, (App.I, § 3), 1976 Plan § 5.2 (App.I, § 1).
 

 4) Level Income Option — a payment option available to employees electing early retirement. Under this option a retiree receives higher monthly pension payments until the time he begins to receive social security payments. At that time, pension payments are reduced, but the level of income remains the same because social security payments make up the difference.
 

 
 *1359
 
 5) Life Insurance and Major Medical Continuation Benefits — by the express provisions of these two plans, coverage terminates when an employee is separated from NL. (App. I, §§ 5, 7) In the case of retirement from active service with NL, coverage is continued.
 

 It is appropriate to note at the outset that the pension scheme envisioned by Congress and enforced by ERISA is essentially voluntary. No employer must have a pension plan, but if it does, the plan must comply with certain minimum standards of vesting and funding. In setting these standards, Congress attempted to strike a balance between the need to protect employees and the need to encourage employers to establish pension plans. House Report No. 93-807, 93d Cong. 2d Sess.
 
 reprinted in
 
 [1974] U.S.Code Cong. & Ad.News 4670, 4677. Unduly stringent standards, it was felt, might have the effect of discouraging the establishment of pension plans.
 
 Id.
 
 at 4678. Thus, within the framework of the statutorily required vesting and accrual schedules, Congress left employers with wide discretion regarding what benefits would be provided by their plans. These benefits previously described, for which the plaintiffs would be eligible if they had continued in NL employment, in effect were forfeited when the plaintiffs were terminated. Was this forfeiture permissible under ERISA? Clearly, vested benefits may not be forfeited except as provided by 29 U.S.C. § 1053. But the threshold issue, as the Supreme Court pointed out in
 
 Alessi
 
 v.
 
 Raybestos Manhattan,
 
 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), is what constitutes a vested benefit. In discussing this issue the Court stated:
 

 ERISA leaves this question largely to the private parties creating the plan. That the private parties, not the government, control the level of benefits is clear from the statutory language defining nonforfeitable rights as well as from other portions of ERISA.
 
 ERISA defines a “nonforfeitable” pension benefit or right as “a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant’s service, which is unconditional, and which is legally enforceable against the plan.”
 
 29 U.S.C. § 1002(6). (Emphasis added)
 

 Alessi, supra,
 
 at 511, 101 S.Ct. at 1900. It is clear that the benefits in question do not meet the definition of “nonforfeitable” because they are conditioned upon the employee’s retirement from active service with NL. Nor are they required to be nonforfeitable, because only benefits defined as “accrued benefits” are required to become nonforfeitable upon meeting the required vesting service.
 
 See
 
 29 U.S.C. § 1053(a)(2). The term “accrued benefit” is defined as “in the case of a defined benefit plan, the individual’s accrued benefit determined under the plan and, ... expressed in the form of an annual benefit commencing at normal retirement age, ...” 29 U.S.C. § 1002(23)(A). Congress has provided some guidance in the legislative history as to what this definition means. The House Report No. 93-807 states:
 

 In the case of a defined benefit plan the bill provides that the accrued benefit is to be determined under the plan, subject to certain requirements. The term “accrued benefit” refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. Also, where the employee moves from one employer to another, the ancillary benefits (which are usually on a contingency basis) would often be provided by the new employer, whereas the new employer would not provide pension benefits based on service with the old employer. Also, the accrued benefit to which the vesting rules apply is not.to include such items as the value of the right to receive benefits commencing at an age before normal retirement age,
 
 *1360
 
 or so-called social security supplements which are commonly paid in the case of early retirement but then cease when the retiree attains the age at which he becomes entitled to receive current social security benefits, or any value in a plan’s joint and survivor annuity provisions to the extent that exceeds the value of what the participant would be entitled to receive under a single life annuity.
 

 Generally, an individual’s “accrued benefit” under a defined benefit plan is to be expressed in the form of an annual benefit commencing at normal retirement age. Normal retirement age is the age specified in the plan, which may not be later than age 65 (or, if later, the 10th anniversary of the time the participant commenced participation in the plan).
 

 H.R.Report No. 93-807, 93d Cong., 2d Sess.
 
 reprinted in
 
 [1974] U.S.Code Cong. & Ad. News 4670, 4726.
 

 It is clear from this passage that the benefits being sought by the plaintiffs are not “accrued benefits” to which vesting rules apply; rather, they are ancillary benefits which may be forfeited without offending ERISA, provided that the forfeiture is rational and does not result in prohibited discrimination or in violation of some specific provision of ERISA.
 
 [5]
 
 With this background in mind I must consider the plaintiffs’ claims to the previously described ancillary benefits.
 

 The plaintiffs argue that they are entitled to the ancillary benefits because those benefits were granted to the recipients of the blanket age 55 retirements at the time of the Dutch Boy divestiture. In the plaintiffs’ view, to deny them these benefits after granting them to other Dutch Boy employees violates ERISA. The plaintiffs rely primarily on § 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). That section states in pertinent part:
 

 (a)(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 

 (A) for the exclusive purpose of:
 

 (i) providing benefits to participants and their beneficiaries; and
 

 (ii) defraying reasonable expenses of administering the plan;
 

 Relying primarily on the analysis in
 
 Winpinsinger v. Aurora Corp.,
 
 456 F.Supp. 559 (N.D.Oh.1978), the plaintiffs argue that this section prohibits any discrimination by Trustees between groups of participants or beneficiaries. In my judgment, the plaintiffs read
 
 Winpinsinger
 
 out of context. In that case, the court was confronted with a retroactive cancellation of past service credits for two groups of employees. The past service credit of another group of employees was not affected. The amendment to the plan thus acted to divest certain employees of vested benefits. The court found that the amendment impermissibly discriminated between groups of employees in violation of § 404(a)(1) of ERISA.
 
 Winpinsinger, supra
 
 at 569.
 

 In contrast, the benefits at issue in the instant case are not vested and may be forfeited without offending ERISA. Accordingly, the restrictive interpretation of § 404(a)(1) given by
 
 Winpinsinger
 
 is not required. The Third Circuit in
 
 Rosen v. Hotel and Restaurant Employees & Bartenders Union of Phila.,
 
 637 F.2d 592 (3d Cir. 1981), indicated that under ERISA, the proper standard of review of a fiduciary’s decision, is the arbitrary and capricious standard.
 
 Rosen, supra,
 
 at 596 n.5. It is inevitable that, given the conflicting needs and desires of various participants and beneficiaries, as well as the need for fiscal soundness of the plan, some groups may be accorded benefits denied to others.
 
 See Adams v. Trustees of the N.J. Brewery Employees’ Pension Trust Fund, et al.,
 
 670 F.2d 387 at - (3d Cir. 1982);
 
 Valle v. Joint Plumbing Industry Board,
 
 
 *1361
 
 623 F.2d 196, 202 (2d Cir. 1980). Providing these decisions are not arbitrary and capricious, and not in violation of specific ERISA provisions, but rather are rationally related to the purposes of the Plan, they will not constitute a violation of the fiduciary’s duties set out in § 404(a) of ERISA, 29 U.S.C. § 1104(a), even if they result in some preferential effect. In short, preferential effect alone does not constitute a violation of § 404(a). It is against this standard that the Trustee’s decision must be gauged.
 

 All of the Dutch Boy employees who were
 
 55 or
 
 reached 55 years of age within three months of the sale date were granted early retirement at reduced benefits pursuant to § 4.3(b) of the 1974 Plan. That section allowed NL to retire at age 55 such individuals “at the convenience of the company”. The plaintiffs, who were not 55 and who did not reach age 55 during the divestment period, argue that they are also entitled to Age 55 Retirement, when they reach that age. Although neither the 1974 nor 1976 Plan gives them this right, they argue that since it was granted to one group of employees it must also be granted to them. It should be noted that there is no evidence whatsoever that Age 55 Retirement was ever granted to employees who had separated from NL prior to retirement age. Nevertheless plaintiffs argue that NL, by its conduct, modified the express terms of the Plans. In-the plaintiffs’ view, because NL granted a blanket Age 55 Retirement to Dutch Boy employees between December 1976 and March 1977, it must now offer Age 55 Retirement as an option to them. This argument ignores one key fact, namely that the plans in question are not “Dutch Boy” plans but NL plans. As such, they apply not only to Dutch Boy employees, but employees of other NL subsidiaries as well.
 
 See Application for Determination for Defined Benefit Plan,
 
 form 5300, dated 8-26-77, attachment “A”, (App. II, § 9.) Thus, the issue of whether NL, by its conduct, modified the express terms of its retirement plans must be assessed by how NL treated all of its Plan participants, not just Dutch Boy employees.
 

 There are no allegations, let alone evidence, that NL began giving Age 55 Retirements as a right to its Plan participants after the Dutch Boy divestment. Indeed, the undisputed evidence is to the contrary, since in the 1976 Plan, the discretion of the company to grant an Age 55 Retirement was considerably narrowed. Under the 1976 Plan, an employee may be retired,
 

 If on the recommendation of the Employer, the Committee is of the opinion that any Participant is unable to perform his duties with the degree of efficiency necessary to meet the work standards of the Employer, whether due to poor health or some other condition beyond his control,
 

 § 5.3(b) 1976 Plan (App. I, § 1). Even viewing the evidence most favorably to the plaintiffs, it appears that the blanket Age 55 Retirement granted at the time of the divestment was a discretionary decision designed to help as many Dutch Boy employees as possible, within the terms of the Plan, to weather the disruption caused by the divestment. Accordingly, there is no evidence from which to conclude that NL, by its conduct, modified either version of the Plan to grant Age 55 Retirement as a right. Nevertheless, I must still consider whether the decision to grant the blanket Age 55 Retirement to eligible Dutch Boy employees was arbitrary and capricious. The plaintiffs argue that it was because the retirees received all of the previously described ancillary benefits while the plaintiffs will not.
 

 The issue, then, is whether the conduct of defendants in connection with the Dutch Boy divestiture resulted in some prohibited discrimination or in some other violation of ERISA by granting Age 55 Retirement with ancillary benefits to some Dutch Boy employees while denying it to others, namely those not 55 at the time of the divestiture.
 

 ERISA has an express anti-discrimination clause incorporated into Title II, 26 U.S.C. § 401(a)(4). That provision prohibits discrimination in favor of three classes of employees: 1) shareholders, 2) officers and 3)
 
 *1362
 
 highly compensated individuals. There are no allegations, nor evidence of this type of discrimination. While apparently plaintiffs concede this point, they argue that the blanket retirement was unfair because it resulted in certain employees with fewer years of service obtaining greater benefits than the plaintiffs with longer service. The benefits in question are continuation of Medical and Life Insurance and the Level Income option since these are the only benefits not tied to length of service. Any NL employee retiring from active service receives these benefits and many of them may have fewer years of service than the plaintiffs. In consequence, that particular unfairness is built into the Plan itself and was not strictly the result of the blanket retirement.
 

 However, blanket retirement did give those who qualified benefits that they, like the plaintiffs, would otherwise not have received. Had NL not exercised its discretion and granted the blanket retirement, these retirees would also have lost the Medical and Life Insurance continuation benefits and Level Income option as well as the other benefits reserved to employees retiring from active service. The issue is, then, was it arbitrary and capricious to exercise discretion and award these benefits to some Dutch Boy employees, when the terms of the Plan precluded awarding them to all of the employees? In my judgment, the answer is, no. Although the disruption created by the divestiture affected all Dutch Boy employees, under the terms of the 1974 Plan then in effect, only employees aged 55 or older could be assisted through a discretionary early retirement. ERISA does require a fiduciary to act in accordance with the terms of a governing plan.
 
 See
 
 29 U.S.C. § 1104(a)(1)(D).
 

 The defendants had a choice of helping some employees or none. Since older employees, in general, have less employment mobility and greater risk of illness and death than younger employees, the disruption caused by the divestiture was likely to impact more adversely on the older group. Accordingly, there was a rational basis for the company’s decision to assist the older employees, even though it could not, under the terms of the Plan, assist everyone. The defendants even-handedly granted Age 55 Retirement to everyone who was 55 years old or who turned 55 within three months of the date of sale. This three month grace period was not arbitrary, but tracked the 90-day transition period written into the Purchase Agreement with ELT.
 
 See
 
 Purchase Agreement § 13(c) (App. II, § 1). In my judgment, the decision to assist the older employees through the blanket retirement was rational. Moreover, since there are neither allegations nor evidence that this decision adversely affected the fiscal soundness of the Plan, I cannot find that the decision wrongfully preferred one group of participants to the detriment of the others. Thus the Plan was applied even-handedly to all those who met the age requirement without injury to other Plan participants or beneficiaries in order to give the maximum number of Dutch Boy employees the maximum benefits allowed under the Plan. In my judgment, the ERISA command to fiduciaries to act solely in the interest of the Plan participants does not require more. Accordingly, the decision to grant a blanket Age 55 Retirement to qualifying Dutch Boy employees at the time of the divestment was not arbitrary and capricious.
 

 In addition to their § 404 arguments, the plaintiffs contend that § 206 of ERISA, 29 U.S.C. § 1056(a) entitles the plaintiffs to Age 55 Retirement. That section states:
 

 In the case of a [pension] plan which provides for the payment of an early retirement benefit, such plan shall provide that a participant who satisfied the service requirements for such early retirement benefit, but separated from the service (with any nonforfeitable right to an accrued benefit) before satisfying the age requirement for such early retirement benefit, is entitled upon satisfaction of such age requirement to receive a benefit to which he would be entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury.
 

 
 *1363
 
 The plaintiffs contend that since there is no service requirement for Age 55 Retirement, this section mandates that they be allowed to receive their accrued benefits when they satisfy the age requirement. In my judgment, plaintiffs’ reliance on this section is misplaced. Neither version of the NL pension plan gives an employee a right to retire at age 55. Nor is there any evidence that NL granted such retirement as a matter of course. Thus, Age 55 Retirement was not a benefit that an employee had any expectation of receiving upon satisfaction of an age and service requirement. Moreover, this retirement has never been granted to anyone who left service before age 55. In drafting § 206, Congress clearly had in mind early retirement benefits to which employees were entitled. The House Conference Report commenting on § 206 states:
 

 [I]f the plan permits an employee who has not separated from service to receive a subsidized early retirement benefit if he meets certain age and service requirements, the plan must also permit an employee who fulfills the service requirement, but separates from service before he meets the age requirement, to receive benefit payments, on an actuarially reduced basis, when the separated employee meets the age requirement.
 

 House Conf. Report No. 93-1280, 93d Cong., 2d Sess.
 
 reprinted in
 
 [1974] U.S.Code Cong. & Ad.News 5038, 5062.
 

 This passage makes it clear that the purpose of § 206 is to insure that if a plan promises the right to receive accrued benefits at an age prior to normal retirement upon meeting certain requirements, then all who meet those requirements are entitled to the earlier retirement date.
 
 [6]
 
 In contrast, neither of the NL plans promises an employee or former employee the right to receive benefits at age 55. Under both plans, the decision to grant Age 55 Retirement is left to the discretion of the company. The restrictions on the exercise of discretion written into the 1976 Plan suggest that the purpose of Age 55 Retirement is to provide a benign method of dealing with employees who might otherwise be fired. The 1976 Plan allows a grant of such retirement when an employee is “unable to perform his duties with the degree of efficiency necessary to meet the work standards of the Employer.” 1976 Plan § 5.3(b) (App. I, § 1). Certainly, neither plan ever provided Age 55 Retirement as a right and § 206 is, therefore, not applicable.
 

 I must address one last argument on the issue of the blanket retirement. The plaintiffs argue that NL’s decision to grant a blanket retirement was arbitrary and capricious because it was impermissible under the terms of the 1976 Plan which was retroactively effective January 1,1976. There is only one problem with this argument — the 1976 Plan, notwithstanding its effective date, was not written and adopted until
 
 *1364
 
 after the blanket retirement had been granted.
 
 See
 
 Form 5300,
 
 Application for Determination for Defined Benefit Plan,
 
 (App. II, § 9). Section 203(a) of ERISA, 29 U.S.C. § 1053(a), prohibits forfeiture of vested pension rights except under four explicit conditions which are inapplicable to this case.
 
 [7]
 

 E.g. Alessi v. Raybestos Manhattan,
 
 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981);
 
 Winpinsinger v. Aurora Corp.,
 
 456 F.Supp. 559 (N.D.Oh.1978). Although Age 55 Retirement is not an accrued benefit and therefore never vests prior to retirement under either plan, once the retirement is granted it is vested.
 
 See Hurd v. Hutnik,
 
 419 F.Supp. 630, 654 (D.N.J.1976). Accordingly, NL could not have applied the 1976 Plan retroactively to withdraw the retirements and benefits that had been granted in December 1976 under the terms of the 1974 Plan, and, therefore, their application of the 1974 Plan to grant the blanket retirement was not arbitrary and capricious.
 

 In sum, I am granting the defendants summary judgment on the Third and Fourth Counts because, even viewing the evidence in a light most favorable to the plaintiffs, they are not entitled to the benefits they seek in these Counts as a matter of law.
 

 D. DISCLOSURE
 

 In the Fifth Count, the plaintiffs allege that the defendants failed to prepare or improperly prepared certain employee benefit plan descriptions as required by ER-ISA, 29 U.S.C. §§ 1021-30. In particular, plaintiffs allege that defendants failed to prepare and distribute plan descriptions of the severance pay and vacation pay plans. Since, as I determined earlier, for summary judgment purposes, it appears that NL had a severance plan subject to ERISA and NL admits it made no disclosure of it, I must deny summary judgment on this Count.
 
 [8]
 
 Moreover, it would be improper on a summary judgment motion to determine whether the plan summaries which were disseminated satisfied the standards of disclosure since that is properly a question of fact. Accordingly, I am denying the defendants’ motion for summary judgment on the Fifth Count. I hasten to add, however, that this Count does not entitle the plaintiffs to a “grabbag” of compensatory damages. There is no indication that Congress intended to create a cause of action for compensatory damages for failure to disclose. The civil enforcement section, 29 U.S.C. § 1132(a)(3) indicates that, at most, plaintiffs would be entitled to an injunctive remedy or other appropriate equitable relief. Since the plaintiffs have not alleged that they ever requested the information required by the disclosure sections, they are not entitled to the penalty (up to $100 a day) specified in § 1132(c).
 

 E. ESOP BENEFITS
 

 In the Sixth Count, the plaintiffs claim entitlement to participation and benefits under an NL Employee Stock Ownership Plan (ESOP) which was established and adopted in 1977 after the Dutch Boy divestiture. The express terms of the Plan exclude from participation the plaintiffs and all of the other former Dutch Boy employees. Only employees may participate and § 2.12 of the ESOP defines employee as—
 

 Any person employed by the Employer except:
 

 
 *1365
 
 (c) Any person who, during his entire period of employment with the Company or with an Employer, subsequent to the effective date of this plan, was employed solely by a division or Subsidiary of the Employer which had ceased to be a division or Subsidiary of the Employer or Subsidiary of the Company before or at the time the Company Contribution for the Plan Year Commencing on January 1, 1976 is made.
 

 ESOP § 2.12(c) (App. I, § 17). Although the Plan became retroactively effective on January 1, 1976, the Company contribution for 1976 was not made until September 15, 1977 (see App. II, § 8). The plaintiffs were employed solely by Dutch Boy, which ceased to be a subsidiary of NL on December 28, 1976, nearly nine months prior to the date of the Company contribution.
 

 The plaintiffs argue that this definition, which excludes them, is arbitrary and capricious and therefore violates the provisions of ERISA. I disagree. I cannot say that it is arbitrary to exclude from retroactive coverage of the Plan employees of divisions that ceased being part of NL prior to the date contributions to the Plan were made. Even reading the evidence most favorably to the plaintiffs, I must find that it is rational to avoid the administrative burden and expense of including in the Plan divisions and their employees who had ceased to be part of NL before implementation of the Plan. Moreover, since these divisions ceased to be subsidiaries of NL prior to the date contributions were made, no contributions were made on behalf of their employees.
 

 The plaintiffs argue, however, that they are entitled to participation under estoppel principles. According to the plaintiffs, a letter written by V. R. McClean, Chairman of the Pension and Employee Benefits Committee, in March 1978, gives the impression that all persons employed by NL in 1976 would be entitled to benefits. That letter states in pertinent part:
 

 Eligible employees who have retired or otherwise have separated from employment prior to December 31, 1976, will receive a distribution of their total interest in the Plan in mid-April.
 

 Letter of V. R. McClean, Exhibit C attached to Affidavit of Frederick T. Davis, filed April 27, 1981.
 

 The Third Circuit in
 
 Rosen v. Hotel & Restaurant Employees,
 
 etc., 637 F.2d 592, 597 (3d Cir. 1981) applied estoppel principles to a pension plan. Quoting from
 
 Williston on Contracts,
 
 the Third Circuit stated:
 

 The principle of estoppel is the ‘representation of fact made to a party who relies thereon with the right to so rely, [that] may not be denied by the party making the representation if such denial would result in injury or damage to the relying party.’
 

 Rosen, supra
 
 quoting 1 S. Williston,
 
 Williston on Contracts
 
 § 139, at 600 (3d Ed. 1957). Clearly, these elements are absent even when viewing the evidence most favorably to the plaintiffs. The McClean letter, which contains the potentially misleading statement, was never sent to any of the plaintiffs. Thus, NL never made a representation to the plaintiffs on which they had a right to rely. Moreover, there is absolutely no evidence of any detrimental reliance by the plaintiffs. Since evidence of such reliance would be within their control, their failure to assert it, if indeed it exists, is fatal. In the absence of detrimental reliance, there is no reason to estop the defendants from denying coverage of the ESOP.
 
 See
 
 Boase v.
 
 Lee Rubber & Tire Corp.,
 
 437 F.2d 527, 534 (3d Cir. 1970). Accordingly, I must grant the defendants’ motion for summary judgment on the Sixth Count. The express terms of the Plan, which exclude the plaintiffs, are not arbitrary and capricious as a matter of law, and there is no evidence on which to base an estoppel argument.
 

 F. PARTIAL TERMINATION
 

 In the Seventh Count, the plaintiffs claim that the divestiture of Dutch Boy constituted a partial termination of the pension plan. Assuming that the plaintiffs are correct, and that there was a partial termination, under § 411(d)(3) of the IRC the partial
 
 *1366
 
 termination only entitles them to full vesting in their accrued benefits. Since the plaintiffs are already fully vested in their accrued benefits, there is no further relief to be granted in this Count.
 
 [9]
 

 It is undisputed that each of the plaintiffs is entitled to receive his or her accrued pension benefits at age 65, the normal retirement age. In addition, those plaintiffs with twenty years of service at NL are eligible to receive actuarially reduced benefits at age sixty. A declaration that the divestiture constituted a partial termination would not entitle the plaintiffs to anything more. Accordingly, I find that summary judgment is appropriate on the Seventh Count.
 

 G. EMPLOYMENT CREDIT
 

 In the Eighth Count, the plaintiffs allege that the defendants arbitrarily credited certain employees with time served at ELT for pension purposes and denied such credit to others. Viewing the evidence most favorably to the plaintiffs, it appears that several Dutch Boy employees did not have the minimum service necessary for vesting in the pension plan. Under the plans, an employee who was not vested would lose all accrued pension benefits upon termination from employment. To avoid this harsh result, NL agreed to credit these employees with time spent at ELT for vesting purposes alone. However, these employees did not continue to accrue NL pension benefits while working at ELT. Accrual of benefits for all the Dutch Boy employees ceased as of the date of termination. Those plaintiffs who were vested pri- or to the divestiture were not unfairly denied any credit for time spent working for ELT because none of the Dutch Boy employees who went to work for ELT continued to accrue benefits. The plaintiffs who were already vested did not need vesting credit, so they cannot possibly claim that they were injured by allowing vesting credit to the few employees who needed it. The vested plaintiffs were, thus, not denied any benefits given to others. Accordingly, I will grant summary judgment to the defendants on the Eighth Count.
 

 IV. CONCLUSION
 

 To summarize, I have decided to grant summary judgment to the defendants on the claims for ancillary retirement benefits (Third and Fourth Counts) and ESOP benefits (Sixth Count). Summary judgment is also appropriate on the claims of partial termination and discriminatory service credit (Seventh and Eighth Counts). Because there are material issues of fact in dispute, I have denied summary judgment on plaintiffs’ claims for severance pay, except as to three retired plaintiffs (First Count), and vacation benefits (Second Count). Summary judgment is also inappropriate on plaintiffs’ claims of inadequate plan descriptions because the adequacy of a plan description is an issue of fact properly resolved at trial (Fifth Count).
 

 An order in conformance with this opinion will be filed by the Court.
 

 [1]
 

 . Although the suit was filed as a class action, it has not been certified yet and therefore will be treated as a suit brought by the named plaintiffs. These individuals are Dominic J. Petrella, Godfrey G. Harms, William E. Blumhagen, Kenneth P. Blair, Lee Terwilliger, Warren F. Jones, Charles Bilinsky, Louis G. Artzberger, Frank A. Mott, Robert G. Arfmann, Thomas W. Pollard, John O. Harrower, Barbara A. Munro and James R. Raber.
 

 [2]
 

 . All citations to appendices refer to the appendices attached to the defendants’ answers to plaintiffs’ first set of interrogatories, filed February 5, 1981.
 

 [3]
 

 . 29 U.S.C. § 186(c) provides in relevant part:
 

 (6) with respect to money or other thing of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, .severance or similar benefits, or defraying costs of apprenticeship or other training programs.
 

 [4]
 

 . Under “Eligibility” the plan provides:
 

 Separation allowances may be granted only to full-time employees who are discharged because of lack of work, elimination of the job or unacceptable job performance. Nonexempt employees with less than 3 months service will not normally receive a separation allowance.
 

 No allowance will be granted in the case of resignations, retirements, or discharges for violation of Company rules (see Policy P-33.-1, Paragraph A).
 

 [5]
 

 . The House Report appears to establish three categories of benefits: 1) accrued benefits, 2) ancillary benefits and 3) other items not included in the definition of “accrued benefits”. The vesting rules apply only to “accrued benefits”. For simplicity, I will refer to all benefits which are
 
 not
 
 “accrued benefits” and are not subject to the vesting rules as “ancillary benefits”.
 

 [6]
 

 . Plaintiffs also argue that § 206 requires that they be given “60/30 Benefits”. As previously described, under 60/30 retirement, an employee with 30 years of service at NL may retire at age 60 with
 
 full
 
 pension benefits. This retirement is not available to employees who separate from NL prior to retirement. These former employees may begin receiving retirement benefits at age 60 provided they have at least 20 years service credit, but their retirement benefits are reduced. It is clear that § 206 permits this variation in treatment between employees and former employees. The House Conference Report gave an example of what § 206 requires:
 

 .. if the plan provides a benefit of $100 a month at age 65, or at age 55 for employees with 30 years of service who are still employed on their 55th birthday, then an employee who separated from service at age 50 with 30 years service, would have the right to draw down an actuarially reduced benefit (perhaps $50 a month) at age 55.
 

 H.Conf. Report No. 93-1280, 93d Cong., 2d Sess.
 
 reprinted in
 
 [1974] U.S.Code Cong. & Ad.News 5038, 5062.
 

 This example demonstrates that § 206 permits differentiation in early retirement benefits between employees and former employees who both meet the same age and service requirements. Since the NL Plan allows former employees to begin collecting reduced benefits at age 60 if they have at least 20 years service credit, the requirements of § 206 are satisfied. In fact, the NL plan is more generous than § 206 which only requires the plan to provide for reduced benefits for those former employees with 30 years service credit. Accordingly, § 206 does not support plaintiffs’ claims for 60/30 benefits.
 

 [7]
 

 . The following conditions are not considered to be forfeitures under § 1053:
 

 1) the plan provides that benefits are not payable if the participant dies. § 1053(a) (3)(A).
 

 2) the plan provides that benefits are suspended while a participant is employed after commencement of benefits. § 1053(a)(3)(A).
 

 3) plan amendments conforming to 29 U.S.C. § 1082(c)(8) are given retroactive effect. § 1053(a)(3)(C). Under § 1082(c)(8) retroactive amendments reducing accrued benefits are only allowed if the Secretary of Labor determines that substantial business hardship necessitates it.
 

 4) the plan provides that withdrawal of benefits derived from mandatory contributions forfeits accrued benefits of participants who are less than 50% vested. § 1053(a)(3)(D).
 

 [8]
 

 . I have not reached the issue of whether the vacation pay plan was subject to ERISA. Accordingly, it is inappropriate at this juncture to determine whether the plan is subject to the Act’s disclosure provisions.
 

 [9]
 

 . Some of the plaintiffs are vested by virtue of time served at ELT credited by NL for vesting purposes. If the divestiture was a partial termination, these plaintiffs would not have had to work for ELT to become vested. Nonetheless, since they
 
 did
 
 work for ELT, and are vested, there is no additional relief possible under this Count and the issue is moot in my judgment. Plaintiffs claim that because other employees left ELT before fulfilling their vesting time the issue of partial termination is important. Those employees, however, are not parties to this suit. Although the issue may be viable as to them, it is moot as to the plaintiffs in this case.