Eugene R. SUTTON, et al., Plaintiffs,

v.

WEIRTON STEEL DIVISION OF NATIONAL STEEL CORPORATION, et al., Defendants.

Gerald W. BRUNNER, et al., Plaintiffs,

v.

NATIONAL STEEL CORPORATION, et al., Defendants.

Civ. A. Nos. 83–0035–W, 83–0040–W.

United States District Court,
N.D. West Virginia,
Wheeling Division.

July 8, 1983.

John R. Spon, Jr., Keith A. Fournier, Spon & Fournier, Steubenville, Ohio, Eugene Green, Youngstown, Ohio, Geary Battistelli, Wheeling, W.Va., for plaintiffs.

David L. Robertson, Peter R. Rich, Weirton, W.Va., for ISU.

Carl H. Hellerstedt, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., and Carl N. Frankovitch, Frankovitch & Anetakis, Weirton, W.Va., for Nat. Steel & Pension Plan.

Anthony F. Phillips, Gerald Kerner, New York City, for Joint Study Committee.

MEMORANDUM OPINION AND ORDER

MAXWELL, Chief Judge.

This litigation grows out of the activities in connection with a proposed employee buy-out plan for the Weirton Steel Division of National Steel Corporation. Defendant National Steel has filed a motion for summary judgment and Plaintiffs in these cases and in *Dhayer, et al, v. National Steel Corporation, et al.,* C.A. No. 83–36–W (N.D. W.Va. filed April 8, 1983) have filed a motion to delay consideration of National's motion pursuant to Rule 56(f), Federal Rules of Civil Procedure.

The Court greatly appreciates the efforts of all counsel in the exhaustive briefing of the issues presented.

The record in this litigation includes the pleadings and exhibits thereto; various affidavits offered in support of as well as in opposition to this motion and other previous motions; and evidence adduced in the form of testimony and documents at two hearings conducted on April 13, 1983, at the Elkins point of holding Court and on April 27–29, 1983, at the Wheeling point of holding court. From these matters of record, the Court finds the following facts are significant to the issues to be decided:

The Weirton Division of National Steel is the single largest private sector employer in the State of West Virginia. At one time, shortly after World War II, the Division had 16,000 workers, but the recent market for steel produced in the United States has reduced employment to some 11,000 in 1980, and about 7,000 currently.

In March, 1982, National Steel announced it would no longer make significant capital investment in its Weirton Division facilities, and that those facilities would be "downsized" over a period of time with a resulting level of employment of 1,200 to 2,000 workers in the late 1980's. The President of National Steel indicated the announcement was not an attempt to win labor cost concessions, but reflected the business decision of National to place its investment capital in other areas. In addition to National's announced intention to downsize the Weirton facilities, the options for the Division seemed to include finding a buyer for the Weirton mill who would be interested in future steel production or to devise a plan for an employee buy-out. National's management indicated a willingness to explore either of these options.

On the day of National's announcement, the International Steelworkers Union announced its intention to work with Weirton Division management to study the possibilities of employee buy-out, and, if feasible, to open negotiations with National Steel. The Weirton Joint Study Committee was incorporated to study the employee buy-out option and coordinate related efforts. The

Committee's board of directors consists of five representatives of the Weirton Division management team, twenty-one representatives of the International Steelworkers Union, and three representatives of the Independent Guard Union. Funds for the various activities of this Committee were raised from the unions involved, community donations, grants from the State of West Virginia, and other sources.

In April, 1982, after a competitive selection process, the Joint Study Committee hired the consulting firm of McKinsey & Co. to conduct a feasibility study on the economic viability of an independent, employee-owned Weirton Steel company. In July, 1982, McKinsey & Co. released a report concluding that such a venture could be successful, but only if labor and production costs were reduced and if substantial capital improvements could be effected over a period of ten years.

The employee buy-out option preferred by the Joint Study Committee and the one pursued includes an Employee Stock Ownership Plan (ESOP), which will allow the new employee-owned corporation to borrow funds to finance the sale from National and permit employees who satisfy minimum hours of work to earn shares of stock as initial loans are paid. An ESOP presents an opportunity for significant tax savings for the proposed company under the Internal Revenue Code.

As the employee buy-out plan progressed, the Joint Study Committee hired other consultants to assist in formulating various complex aspects of the procedure. These include the law firm of Ludwig & Curtis, of San Francisco, to advise on the structure of an ESOP; the law firm of Wilkie, Farr & Gallagher, of New York, to represent the Committee and the proposed new corporation in negotiations with National Steel regarding acquisition of the Weirton Division assets; the investment banking firm of Lazard Freres & Co., of New York, to assist with all questions of finance; the accounting firm of Towers, Perrin, Foster & Cros-

by, of Pittsburgh, to conduct an audit of National's pension plans for Weirton Division employees. All of these consulting firms, and others involved in the study, enjoy national or international reputations for expertise in the fields for which they were hired.

During the summer of 1982, the Independent Steelworkers Union conducted elections which resulted in a new Union leadership team, and by virtue thereof, new Union representation on the Joint Study Committee. The former president of the Union, Richard Arango, filed unfair labor practice charges against National Steel and the Independent Steelworkers Union with the National Labor Relations Board on April 5, 1983. The charges allege representatives of the employer (National Steel) have participated on a negotiating committee which purports to represent bargaining unit employees in collective bargaining negotiations with the employer. The Court presumes the "negotiating committee" means the Joint Study Committee, on which Arango formerly served as co-chairman by virtue of his Union presidency. One of the *Sutton* plaintiffs, William Willoughby, served on the committee's board of directors until he was voted out of his Union office of Vice-Chairman, Tin Mill Division.

On March 11, 1983, National Steel and Wilkie, Farr & Gallagher (the law firm hired to negotiate a sale of Weirton Division assets for the Joint Study Committee) announced an agreement in principle for the terms of sale from National to Weirton Steel Corporation (the proposed employee-owned company). The agreement has been amended by an addendum announced April 8, 1983. During 1983, Wilkie, Farr & Gallagher formed a "shell" corporation in the State of Delaware in anticipation of the success of the employee buy-out venture.

In order to carry out the provisions of the agreement in principle, as amended, and to implement the employee buy-out, members of the Independent Steelworkers Union and the Independent Guard Union must conduct

an election to modify existing collective bargaining agreements with National Steel. Both the mechanisms of the employee buy-out and the implications of such a venture are extremely complex. In order to inform union memberships of the various aspects of the proposal, the Joint Study Committee and its consultants have taken steps to produce a "disclosure document" which they hope will reveal all of the facts necessary to an understanding of the venture and its ramifications for the employees of the new Weirton Steel company.

Should the employee buy-out be implemented, Weirton Steel Corporation will succeed National Steel's Weirton Division as the largest private-sector employer in West Virginia. It will also be one of the largest corporations in the United States and *the* largest employee-owned corporation in the country. As all the parties are aware, the venture (like any large corporate undertaking) is not without risk. Consultants for the Joint Study Committee believe success is possible, given certain economic and social circumstances. However, it must be realized that such expressions are only educated forecasts. Long term success depends upon the general economic trends, as well as trends specifically involving markets for the products produced at the Weirton facility.

For members of the Independent Steelworkers Union and the Independent Guard Union, two personal choices must be made before an employee-owned company can become a reality. First, as mentioned earlier, a majority of the Union members must decide to vote in favor of amendments to the existing collective bargaining agreement which will reflect the terms of sale from National to the new Weirton Steel company. Second, each member must make a personal decision on whether to become an employee of the new company. For some workers, the second decision will be made more difficult because of the opportunity for immediate retirement from National with totally predictable pension

and other benefits for the future. The terms of sale, as amended, include provisions that employees meeting the chronological age and years of service requirements, for some of the types of retirement in the applicable pension plan, may elect to retire five days after the union votes referred to above. Such decision to retire will be effective as of April 30, 1983, a date before the transfer of ownership, but a date set for accounting purposes.

All workers, whether they choose to work for the new company or not, will retain the pension benefits earned through service with National Steel prior to the transfer of ownership. Naturally, pension rights earned and accrued after the transfer of ownership (with the exception of certain "safety net" features to be discussed below) will be the responsibility of the new employee-owned company. Plaintiffs express the concern that pension rights earned after transfer to the new company will not be as secure as those earned under National Steel, which has a proven record of corporate stability.

Of course, the union members may decide not to go forward with the proposed employee buy-out and in such event the underlying issues will be moot. While the alternative appears to be massive unemployment in the tri-state community, the workers may feel that the risks of a new steel production venture in an uncertain market are too high. In short, the ultimate decision on whether to go forward with the employee buy-out rests with the members of the unions through their approval or disapproval of the terms of sale and other aspects of the new venture.

STATEMENT OF THE ISSUES

This litigation focuses on the propriety of terms of sale regarding pension and severance pay benefits for members of the Independent Steelworkers Union. Amendments to existing pension and collective bargaining agreements must be approved before a transfer of the Weirton Division from National Steel to an employee-owned entity can be effected.

Defendant National Steel filed a proposed statement of the issues and requested expeditious consideration of them. This was followed by the instant motion for summary judgment. Counsel for Plaintiffs in the *Sutton* case have also filed a statement of the issues. The Court believes the issues presented by National's motion are fair statements of the major claims of the complaint in *Brunner* and many of the claims in *Sutton,* and those claims that should be decided before union members are asked to vote on the proposed employee buy-out. Not all of the issues raised in *Sutton* and *Brunner* are included in the request for summary judgment, and, therefore, the Court views National's motion as a motion for partial summary judgment. The remaining, less pressing issues presented by the complaints can be resolved through later proceedings.

As will be more carefully detailed below, the terms of sale between National Steel and an employee-owned company specify that the transfer of ownership, without more, will neither trigger entitlements to 70/80 retirements or Rule of 65 retirements under the applicable pension plan nor establish severance allowance payments under the applicable collective bargaining agreement. The terms also limit eligibility to 70/80 and Rule of 65 retirement after the transfer. The complaints in *Brunner* and *Sutton* charge, inter alia, that the failure of the transfer to trigger rights to these employee benefits violates various provisions of the Employee Retirement Income Security Act (ERISA), various other provisions of labor law, and the terms of the applicable pension and collective bargaining agreements. In general, the motion for summary judgment presents the legal issue of whether the terms of sale, which are proposed to amend existing pension and collective bargaining agreements, deprive any Plaintiff of a right or benefit guaranteed by law.

From an examination of the pleadings, the motion for summary judgment, and other matters of record, the Court defines the following two specific issues for resolution by this partial summary judgment proceeding:

1. Whether the terms of sale proposed to amend the Rule of 70/80 and Rule of 65 retirement provisions of the pension agreement between National Steel Corporation and the Independent Steelworkers Union violates:

a. provisions of ERISA relating to prohibited transactions;

b. provisions of ERISA relating to fiduciary duties imposed upon National Steel or the pension plan;

c. provisions of ERISA relating to vested accrued benefits or non-forfeitable benefits;

d. provisions of the pension or collective bargaining agreements, or

e. other provisions of labor law as specified in the complaints.

2. Whether the terms of sale proposed to amend severance allowance provisions of the collective bargaining agreement between National Steel Corporation and the Independent Steelworkers Union violates:

a. provisions of ERISA relating to prohibited transactions;

b. provisions of ERISA relating to fiduciary duties imposed upon National Steel;

c. provisions of ERISA relating to vested accrued benefits or non-forfeitable benefits;

d. provisions of the collective bargaining agreement, or

e. other provisions of labor law as specified in the complaints.

At various points in the *Brunner* and *Sutton* complaints it is alleged that National Steel and the Independent Steelworkers Union acted in concert. Although the instant motion has been propounded only by Defendant National Steel, the Court must necessarily examine actions by the Union to reach the issues presented.

It is important at this point to specify matters the Court does not consider in its decision on the motion for partial summary judgment. Several claims by the Plaintiffs have earlier been resolved on motion to dismiss, and need not be further considered here. These include the claim that the Joint Study Committee exceeded its corporate charter, as was alleged in the *Brunner* complaint, and the claims that the actions of Defendants violated the West Virginia Labor Management Relations Act and other policies of the Government of West Virginia, as alleged in the *Sutton* complaint.

In addition, as has previously been mentioned, Richard Arango, who is not a party to this litigation, but who is represented by counsel who is also representing the *Brunner* Plaintiffs, has filed unfair labor practices charges before the National Labor Relations Board (NLRB). Several allegations charging violations of federal law in the *Brunner* complaint at §§ 21, 36, and 43, and in the *Sutton* complaint at §§ 210, etc., involve the same factual and legal questions as have been presented to the NLRB in the above-referenced unfair labor practices charges. The Court is of the opinion that those claims which directly relate to the legality of the Independent Steelworkers Union and the Independent Guard Union joining forces with Weirton Division management, through the Joint Study Committee, to negotiate terms of the sale of the Weirton Steel Division to a proposed employee-owned corporation should await a decision by the NLRB, the administrative body having special competence in this area.

Finally, the Court would note that this litigation has focused on the effects of the proposed sale on the Independent Steelworkers Union and its members to the exclusion of members of other unions and non-union, salaried employees at the Weirton Division of National. The answer of Defendant Union in *Sutton* denies that all Plaintiffs in that civil action are actually members of the Union. That is a factual issue that must be left for later resolution.

This Opinion and Order will only affect those Plaintiffs who are members of the Independent Steelworkers Union who are production, maintenance, and hourly-rated clerical employees. The litigation has also focussed on the legality of the terms of sale which, if approved, will modify terms of existing pension and collective bargaining agreements to the exclusion of such terms of employment, compensation, etc., for workers of the new employee-owned company that may be negotiated by the Union and management representatives of the proposed company.

## ISSUES AFFECTING BOTH PENSION AND SEVERANCE CLAIMS

The specific issues presented by the instant motion must be decided in the context of an employer desiring to close a substantial portion of a major steelmaking plant and the employees taking steps to pursue an employee buy-out, with the support and aid of the community. There are some underlying principles of law which will control the Court's decision on both the pension and severance allowance questions.

At the outset, the Court would note that unions are, and should be, permitted to pursue unique procedures and mechanisms to avoid loss of employment for union members when faced with crisis-type situations, such as an impending plant closure. *See United Steelworkers of America v. United States Steel Corp.*, 492 F.Supp. 1, 9–10 (N.D.Ohio), *aff'd in part, rev'd in part*, 631 F.2d 1264 (6th Cir.1980). It has been held that unions and employers in such circumstances may take steps not contemplated in existing documents controlling normal labor relations. *See Ekas v. Carling Nat. Breweries*, 602 F.2d 664, 666–667 (4th Cir.1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 646 (1980). Indeed, the parties here are exploring relatively uncharted waters. The employee buy-out, if approved and implemented, apparently will result in the largest employee-owned company in the nation.

All parties agree that the March 2, 1982, announcement by National Steel that it

would no longer invest in its Weirton Division was not a ploy to coerce workers into giving labor cost concessions. It was an economic decision by the corporation to place its investment capital in other areas. It is further uncontroverted that National expressed willingness to explore an employee buy-out or other option. (Bish Affidavit, *Brunner* case, Paper 5, § 8); (Willoughby Affidavit, *Sutton* case, Paper 21, § 12); The Independent News, March 16, 1982, at 1 (Plaintiffs' exhibit 10, hearing of April 27, 1983); Letter of Richard Arango (Plaintiffs' Exhibit 9, hearing of April 27, 1983). In general, it would appear the employer and the employees took appropriate positions and pursued appropriate activities in the circumstances. Though not concerned with National's economic decision to phase-out Weirton Division, employer and employees began to explore avenues to ameliorate the effects of the decision. *See generally, First National Maintenance Corp. v. N.L.R.B.,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981).

■ As earlier stated, the terms of sale at issue here must be approved by a union vote as amendments to existing agreements with the employer before they can be implemented. There have been claims by Plaintiffs that it is unlawful to modify in any way the employee rights created under an existing agreement. (See, e.g., *Sutton* complaint at §§ 214, 219, 221; *Brunner* complaint, at § 48.) The collective bargaining agreement (at Article XXI) contains provisions allowing amendments and modifications. In addition, it is clearly permissible for union leadership to recommend to the membership a modification to an existing agreement, *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), even where the contract does not provide for amendments. *See Battle v. Clark Equipment Co.,* 579 F.2d 1338, 1347 (7th Cir.1978). Modifications to existing contracts are frequently negotiated when the union is faced with a plant closing or phase-out. *Id.* and *Ekas v. Carling Nat. Breweries, supra,* 602 F.2d at 666–667.

■ Further, it is not per se unlawful to modify prospective pension or severance pay benefits, provided that no ERISA or other labor law is violated by the change. *See Fentron Industries v. Nat. Shopmen Pension Fund,* 674 F.2d 1300, 1306 (9th Cir. 1982). Nor is it impermissible to negotiate for changes in such benefits when an employer announces a plant closing or partial closing. *N.L.R.B. v. North Carolina Coastal Motor Lines, Inc.,* 542 F.2d 637, 638 (4th Cir.1976).

It is the view of the Court that the issues of labor organization law raised by these complaints boil down to whether the Independent Steelworkers Union leadership's acceptance of the terms of sale, involving severance allowances and pension benefits, as negotiated by the Joint Study Committee consultants, and the expected Union recommendation to its membership that it vote in favor of the terms of sale, is a breach of the Union's duty of fair representation. (See *Brunner* complaint at §§ 35–36, 45–48; *Sutton* complaint at §§ 200, 209–210, 212.)

■ It is well established that labor unions have a statutory duty to fairly represent all employees in the bargaining unit in collective bargaining and enforcement of bargaining agreements. The duty includes an obligation to serve all members without discrimination and to exercise union discretion with good faith and honesty, and to avoid arbitrary conduct. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The breach of such duty occurs only when a union's conduct is arbitrary, discriminatory, or in bad faith. *Id.* at 190, 87 S.Ct. at 916.

■ On the basis of reasoning set forth below, the Court concludes that the proposed amendments to the pension agreement and to severance pay allowance provisions in the collective bargaining agreement violate neither ERISA nor the terms of existing agreements. Therefore, it cannot be said that the Union will act in bad faith in recommending the terms of sale, with

the amendments to said agreements, to its membership. Because the amendments apply to all Union members equally (indeed, most amendments apparently will affect all employees at National's Weirton Division, whether Independent Steelworkers members or not), it cannot be said that the Union acted with discrimination toward any sub-group of the membership. *See generally, Ekas v. Carling Nat. Breweries, Inc., supra,* 602 F.2d 664.

There is no doubt that the Joint Study Committee is union-dominated. (See Articles of Incorporation, Exhibit to Affidavit of Walter Bish, Brunner case, Paper 5.) The evidence adduced at the two hearings on preliminary injunctive relief earlier conducted has impressed the Court with the quality and scope of consulting firms employed by the Joint Study Committee. It appears that each major step in the complex process of arranging for the proposed employee buy-out—feasibility, financing, auditing existing labor costs, corporate structure, terms of sale, etc.,—has been entrusted to firms with national or international reputations. Testimony adduced indicates that the Committee extensively relied on the work of the experts hired. Plaintiffs have made no specific allegation that the decision to recommend the severance allowance and pension benefit amendments was arbitrary, and, under the circumstances, it would appear that such an allegation would be insubstantial.

In conclusion, the Court is satisfied that the Union violated no duty of fair representation with regard to severance allowance and pension benefit amendments in the *Sutton* and *Brunner* cases.

In addition, union fiduciary duties in regard to employee welfare plan participants and beneficiaries arising under ERISA or other federal labor law are not necessarily implicated when union leadership participates in negotiations for amendments to existing agreements and recommends the products of such negotiations to union membership. *See NLRB v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), *Carr v. Learner,* 547 F.2d 135 (1st Cir.1976). *See generally, UMWA Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). This Court is of the view that this principle applies in the instant, unique situation when agents negotiate with the employer on behalf of a union-dominated committee.

## PENSION BENEFIT ISSUES

Under the existing pension agreement between National Steel and the Independent Steelworkers Union, there are eight distinct types of retirement, or methods of determining eligibility for a pension.[1] For normal retirement; 62/15 retirement; 30-year retirement, and 60/15 retirement, the plan participant becomes eligible simply through achievement of certain chronological age and years of service factors. Participants with 15 years of service who become permanently incapacitated, as defined in the plan, are eligible for permanent incapacity retirement. Persons with 10 years of service whose continuous service is broken for any reason are eligible to receive a deferred vested pension after reaching age 62 or 65, depending on the participant's age at the time service was broken. The remaining types of retirement, rule of 65 retirement

1. National Steel Corporation maintains a pension plan (referred to in the record as Plan 001) for all types of employees (union and non-union) at various corporate facility locations including the Weirton Division. A copy of the plan has been made part of the record in each case before the Court as Exhibit A, Affidavit of John A. McCreary. The Independent Steelworkers Union has negotiated a pension agreement for their members which provides substantially the same benefits as Plan 001. A copy of this agreement has been made a part of the record in each case as Plaintiffs' Exhibit 4, hearing of April 27, 1983. Unless the corporate plan is specifically mentioned, the Court relies upon the language of the Union pension agreement for all purposes having to do with this motion for summary judgment. Thus, whether the Court refers to pension plan or pension agreement, reference is made to the Union pension agreement.

and 70/80 retirement, are the subject of the pension issues in this litigation. While age and years of service are aspects included in determining eligibility, other factors are as follows:

70/80 Retirement

2.6 Any participant who has not attained the age of 62 years and who shall have had at least 15 years continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more, or (ii) whose combined age and years of continuous service shall equal 80 or more, and

(a) whose continuous service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof or by reason of a layoff or physical disability, or

(b) whose continuous service is not broken and who is absent from work by reason of:

(1) a layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, or

(2) a physical disability or a layoff other than a layoff resulting from an election referred to above and whose return to active employment is declared unlikely by the Company, or

(c) whose continuous service is not broken and who, while on layoff status by reason of his election to be placed on such status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, accepts a job with the Company and, prior to the expiration of 90 consecutive calendar days from the first day worked on such job, elects to retire, or

(d) who considers that it would be in his interest to retire, and the Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions,

shall be eligible to retire on or after July 31, 1980 and shall upon his retirement (hereinafter "70/80 retirement") be eligible for a pension

Rule-of-65 Retirement

2.7 Any participant (i) who shall have had at least 20 years of continuous service as of his last day worked, (ii) who had not attained the age of 55 years, and (iii) whose combined age and years of continuous service shall equal 65 or more but less than 80, and

(a) whose continuous service is broken by reason of a layoff or disability, or

(b) whose continuous service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, or

(c) whose continuous service is not broken and who is absent from work by reason of a physical disability or a layoff other than a layoff resulting from an election referred to above and whose return to active employment is declared unlikely by the Company, or

(d) who considers that it would be in his interest to retire, and the Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions,

and who has not been offered suitable long-term employment as defined in Appendix A, shall be eligible to retire on or after July 31, 1980, and shall upon his retirement (hereinafter "rule-of-65 retirement") be eligible for a pension; provided, however, that if at the time of application for retirement the Company has not yet determined whether the participant will be offered suitable long-term employment, the participant will not be eligible to retire until the earlier of the date on which the Company advises the participant that he will not be offered suitable long-term employment or the

date on which the participant incurs a break in continuous service.

In addition, among the provisions in the plan for calculating the amount of pension under the various types of retirement, increased pensions are described for 70/80 and rule of 65. With certain exceptions, the monthly amount determined under the regular rules is now increased by $400.00 for beneficiaries of 70/80 and rule of 65 retirement.

The terms of sale from National to the employee-owned company will require a number of changes in the existing pension agreement. However, no change will be effected that will decrease any accrued benefit as determined under the existing plan, and National Steel shall remain liable for all accrued benefits "earned" prior to the closing date. Under the terms of sale, National will segregate the liabilities and assets of the existing fund attributable to Weirton Division employees (the existing fund covers employees at other National Steel divisions in addition to Weirton) and establish a separate trust fund and insurance contract which will only be available to pay benefits to Weirton Division employees, including those already retired, those transferring to the new company, and those on layoff status.

Those employees of National Steel who remain working under the new employee-owned company will, in effect, look to both National and the new company for pension benefits upon retirement. The terms of sale provide a method of calculating benefits payable by each company, which is based on an individual's years of service with each employer.

Especially pertinent to this litigation are the terms which modify the eligibility for 70/80 retirement and rule of 65 retirement and the increased pension benefits for these types of retirement. For transferred employees only (those who were employees of National and who choose to become employees of the new company), conditions giving rise to eligibility for 70/80 and rule of 65

retirement will be limited to a permanent shutdown, as defined in existing pension and collective bargaining agreements, which occurs within five years of the transfer of ownership date for accounting purposes (May 1, 1983). The increased pension ($400 per month) will only be payable if a permanent shutdown occurs. The terms of sale also require that the pension and collective bargaining agreements be modified to reflect the fact that the sale and transfer of ownership does not constitute a shutdown for purposes of pension or retirement benefits or severance allowance. (Thus, the sale and transfer of ownership, without more, will not trigger eligibility to any of these benefit programs.)

The Court earlier stated that it is not per se unlawful to alter a pension plan with respect to prospective benefits, provided the change doesn't violate other ERISA requirements. The Court must now decide whether the amendments proposed to 70/80 retirement and rule of 65 retirement violate the Act's minimum requirements for vesting, accrued benefits, or non-forfeitability.

■ In general terms, the labor law provisions of ERISA provide a system of safeguards designed to strengthen private employee pension and welfare benefit plans. (The provisions of ERISA made part of the Internal Revenue Code are generally not at issue here.) ERISA does not require an employer to offer any type of benefit, but, if it does so, the plan must comply with the minimum requirements of the Act.

■ With regard to pensions, ERISA imposes no obligation on a plan to pay benefits before an employee reaches normal retirement age. Any right to earlier benefits must be found in the individual agreement. *Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983) (citing *Pompano v. Michael Schiavone & Sons,* 680 F.2d 911 (2nd Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). Under ERISA, normal retirement age means the earlier of normal retirement age under the plan or

the later of the time the participant attains age 65 or reaches the 10th anniversary of participation in the plan. 29 U.S.C. § 1002(24). The plan in issue defines normal retirement age as 65.

An accrued benefit is the interest in the plan to which a participant has become entitled. Am.Jr.2d *Pension Reform Act* § 73 (1975). In the case of a defined plan, such as at issue here, it means an individual's rights to a retirement benefit determined under the plan, expressed in the form of an annual benefit starting at *normal retirement age.* 29 U.S.C. § 1002(23)(A) (emphasis supplied). A nonforfeitable pension benefit or right is a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, *which is unconditional,* and which is legally enforceable against the plan. 29 U.S.C. § 1002(19) (emphasis supplied). In sum, ERISA is designed to protect plan benefits for normal age retirement which are unconditional.

Accrued benefits under ERISA do not include such things as conditional benefits, premiums for medical and life insurance payable as a lump sum, or the value of the right to receive early retirement benefits. *See* H.R. Report No. 93–807, 93rd Cong., 2d Sess. ——, *reprinted in* 1974 U.S.Code, Cong. & Ad.News 4639, 4670, 4726. Am. Jur.2d *Pension Reform Act* § 73 (1975). *See generally, Petrella v. NL Industries,* 529 F.Supp. 1357, 1365–1366 (D.N.J.1982). These are ancillary benefits which may be amended or deleted without violating ERISA. *Id.*

An examination of the eligibility requirements for 70/80 and rule of 65 retirement reveals they are conditional and in the nature of early retirement benefits and cannot be considered non-forfeitable or as an accrued benefit. *Capocci v. General Motors Corp.,* 444 F.Supp. 1306, 1307–1308 (D.Hawaii 1978). Since the increased $400.00 per month pension payment is conditioned upon eligibility for 70/80 or rule of 65 retirement, it cannot be considered non-forfeitable. The Court has considered the potential applicability of 29 U.S.C. § 1056(a) and finds that it does not require a contrary mandate on the issues raised here.

■ Under ERISA, "vesting" is a term that is tied to the term "accrued benefit." To prevent any possible misunderstanding of the Court's language in the previous paragraph, the proposed terms of sale with regard to 70/80 and rule of 65 retirement and the increased pension payments thereunder do not violate any minimum vesting standards under ERISA. This is because the terms of sale affecting pensions do not disturb the normal retirement benefit or the deferred vested pension benefit, *See* 29 U.S.C. § 1053, and since the terms of sale provide that all accrued benefits shall become vested upon transfer of ownership. *See* 26 U.S.C. § 411(d)(3).

In short, Congress did not intend to impose upon a plan a requirement that any benefits be payable before reaching age 65 or the normal retirement age (65 in this case) under the plan. *Riley v. MEBA Pension Trust,* 452 F.Supp. 117, 120 (S.D.N.Y.) *aff'd,* 586 F.2d 968 (2nd Cir.1978).

■ Plaintiffs in the *Sutton* litigation also allege Defendants have failed to provide sufficient information about the proposed amendments and thus allege a violation of ERISA. The Court is unable to find any provision of the Act that would mandate an employer to supply information regarding amendments before the amendments are effected. 29 U.S.C. §§ 1022, 1024(b). *See* 29 C.F.R. §§ 2520.104b–3 and –4. Further, it appears uncontroverted that each member of the Independent Steelworkers Union was supplied with a copy of the agreement in principle setting forth the terms of sale (including those proposed to amend pension agreements) prior to the filing of the *Sutton* action.

Plaintiffs also claim amendments to the pension plan violate the basic terms of the

agreement itself. The corporate plan document includes additional administrative provisions beyond those included in the Union pension agreement. Those provisions include, in Section VIII, National's power to amend or modify the program within certain bounds not applicable here. (The Court presumes the section on amendments is part of the pension agreement applicable to Union members. In any case, all pension plans subject to ERISA must include a provision for plan amendment. 29 U.S.C. § 1102(b).) The current collective bargaining agreement also provides for amendments in Article XXI.

▉ Plaintiffs' allegation that the amendments violate the plan itself would seem to assume that all provisions in the agreement are "written in stone," and never subject to change. Such is not sound law. *See generally, UMWA Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). As the Court understands, a proposed amendment would only violate the language of the agreement when a particular individual's unconditioned rights are affected (or the amendment is unreasonable). *Rochester Corp. v. Rochester,* 450 F.2d 118 (4th Cir.1971). In other contexts, but in cases arising under ERISA, the Supreme Court has said, "it is the claim to the benefit rather than the benefit itself that must be 'unconditional' and 'legally enforceable against the plan.'" *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). *Nachman Corp. v. P.B.G.C.,* 446 U.S. 359, 371, 100 S.Ct. 1723, 1731, 64 L.Ed.2d 354 (1980). Since the Court has earlier found that any rights a particular Plaintiff might have under 70/80 and rule of 65 retirement are contingent and conditional, it must also find that a proposed amendment to the provisions for these types of retirement do not violate the terms of the agreement itself.

Further, the proposed changes must be seen as reasonable. They are proposed in the context of an anticipated change in ownership where the majority of active workers will immediately become employees of the new owner. Since a "shutdown" of National's Weirton Division is not anticipated, in any sense, it is reasonable to propose amendments which would clarify existing language regarding shutdown and suitable long-term employment. The present eligibility for 70/80 and rule of 65 retirement conditions also include such things as layoff, disability, and other matters involving the discretion of the employer. Since the amendments proposed only affect a situation that would arise after a transfer of ownership, the Court must find that eliminating such conditions are reasonable since they are properly the concern of the relationship between the new employer and the employee. (Indeed, it is uncontroverted that it is presently the plan of the Union to demand substantially the same pension benefits as presently exist from the new employer.)

Plaintiffs have not directed the Court's attention to any provision of the collective bargaining agreement which would preclude any amendments, or the specifically proposed amendments, to the pension agreement. The Court perceives no aspect of the collective bargaining agreement which would bar pension agreement modifications. Therefore, the terms of sale that propose to amend the pension agreement do not violate the terms of the collective bargaining agreement between National Steel and the Independent Steelworkers Union.

The terms of sale negotiated on behalf of the Joint Study Committee include what has been labelled by counsel as a "safety net" feature. In effect, National will continue to offer its former employees 70/80 and rule of 65 retirements if, and only if, the new company should suffer a shutdown of substantially all of its facilities within five years of the closing or transfer date. National Steel was not required to extend this "safety net" feature of its former employees under ERISA. This is merely a term of sale negotiators acting for the Joint

Study Committee were able to extract from National Steel on behalf of those employees who will transfer employment to the new company.

Plaintiffs contend that the terms of sale, if carried out, will result in a prohibited transaction and a violation of fiduciary duties under ERISA. (*Brunner* Complaint §§ 14, 16, 17, 30; *Sutton* Complaint §§ 186, 211.)

These allegations appear to have several bases. First, one of the Plaintiffs in *Sutton* asserts that the sole motivation of National Steel in desiring to divest or "downsize" the Weirton Division is to avoid unfunded pension "obligations" to employees. (Affidavit of Willoughby, *Sutton* case, Paper 21.) This allegation is also made in the *Brunner* complaint at § 17. This assertion is contrary to other evidence offered by Plaintiffs in several respects. (*See,* e.g., Letter of Richard Arango, Plaintiffs' Exhibit 9, hearing of April 27, 1983; The Independent News, March 16, 1982, at 1, Plaintiffs' Exhibit 10, hearing of April 27, 1983; Proposals for Acquisition from National Steel, etc., at Section III, Exhibit to amended complaint in *Sutton,* Paper 11; National Steel Corporation news release dated March 2, and excerpt from 1982 Annual Report, Exhibits to Affidavit of Willoughby dated June 28, 1983, *Sutton* case, Paper 29A.)

Second, Plaintiffs assert that "vested inchoate pension benefits" are being "sold" or constitute part of the sale proposed between National Steel and a new company. (See, e.g., *Sutton* case, Paper 22 at § 3.) This assertion is directly contrary to other evidence offered by Plaintiffs. The terms of sale proposed in the agreement in principle announced March 11, 1983, clearly indicate that all assets and liabilities of National Steel's pension that affect any former or present Weirton Division employee will be segregated and transferred to a separate trust, fund, and/or insurance contract, which will be available only to pay benefits to Weirton Division employees. No "vested inchoate pension benefits" will be sold by National to anyone. The Court recognizes that pension issues are a factor considered by all parties to the proposed sale (*See* pension calculations audit by Towers, Perrin, Forster & Crosby at 1, Plaintiffs' Exhibit 23, hearing of April 27, 1983.), but no pension "obligations" are being transferred from National Steel to the new employee-owned company.

Grant of summary judgment is precluded where there is a genuine dispute as to material facts in issue, even where the assertions of the opposing party are fantastic or highly improbable. *Arnstein v. Porter,* 154 F.2d 464 (2nd Cir.1946). Here, it is the opinion of the Court that the two sets of allegations set forth above do not preclude summary judgment. The assertions with regard to National Steel's motivations for divestiture are not disputed since there is only a conflict in the evidence offered by Plaintiffs. No Defendant has offered a factual basis for National's motivation. The assertions with regard to a sale of "vested inchoate pension benefits" is in conflict with credible and uncontroverted facts and must be viewed as a mistake or a frivolous assertion designed merely to avoid summary judgment. *See* Fed.Proc., L.Ed. § 62:550 (1981). A rational interpretation of the evidence presented by Plaintiffs concerning National's motivation would be that avoiding future pension obligations to employees of the Weirton Division was *one* of the factors motivating National Steel to consider "downsizing" or divesting the Division. In deciding the prohibited transaction and fiduciary duty questions, however, the Court will assume that avoiding future pension obligations was the sole motivation of National, as alleged by Plaintiffs. The Court does not find that any vested pension rights or benefits are being sold.

A third basis for the allegations of prohibited transaction or fiduciary duty violations appears to be the earlier mentioned fear of some Plaintiffs that some pension rights "earned" after transfer to the new company will not be as secure as those

"earned" under National Steel. (Affidavit of Willoughby, *Sutton* case, Paper 21, at §§ 7–9.) (Certain pension benefits earned or accrued as an employee of the new company will be insured by Pension Benefit Guaranty Corporation, although the Court recognizes that some ancillary benefits are not insured.)

A fourth basis for the allegations appear to be the assertion that National Steel has not acted solely in the interests of pension plan beneficiaries and participants. (*See, e.g., Brunner* complaint at § 45; Sutton complaint at § 186.)

Plan fiduciaries must discharge duties with respect to an employee benefit plan solely in the interests of plan participants and beneficiaries. 29 U.S.C. § 1104. The fiduciary must act for the exclusive purpose of providing benefits to beneficiaries and must conduct the affairs of the plan with the care, skill, prudence, and diligence under the circumstances that a prudent man would use. Further the fiduciary must diversify the plan investments so as to minimize the risk of large losses, and must act in accordance with the documents and instruments governing the plan insofar as they are consistent with law. *Id.* In addition to the general fiduciary standards set forth in § 1104, certain specific rules relating to defined prohibited transactions are contained in 29 U.S.C. § 1106. A fiduciary is not permitted to have the plan engage in certain direct or indirect transactions with a party in interest. A plan fiduciary is also not permitted to deal with plan assets in his own interest, on behalf of persons whose interests are adverse to the interests of the plan, or receive any personal consideration as a result of plan transactions. *Id.*

According to the terms of the pension agreement, it is clear that National Steel, as plan administrator, is a fiduciary and must carry out duties with regard to plan management in accordance with the fiduciary standards set forth above. An examination of the more extensive corporate plan document together with the Union pension agreement reveals that certain designated National employees administer the plan with respect to payment of benefits, etc., but that the plan is financed through contributions to a trust fund managed and held by a separate entity.

It is the opinion of the Court that the duties with regard to prohibited transactions apply directly to activities affecting the fiscal assets of the plan funds. In other words, for the provisions of 29 U.S.C. § 1106 to apply, there must be a transaction involving the monies, property, or other assets of the fund. *See Donovan v. Bierwirth*, 680 F.2d 263, 270 (2nd Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). This notion flows from the very language of the statute itself ("A fiduciary . . . shall not cause the plan to engage in a transaction . . . , etc.) and is supported by the legislative history. *See* H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2d Sess., ——, *reprinted in* 1974 U.S.Code, Cong. & Ad.News, 5038, 5087–5089.

The segregation of National Steel pension fund assets relating to Weirton Division employees for transfer to a separate trust account, as contemplated in the terms of sale, is not the type of transaction, in the Court's judgment, which would invoke 29 U.S.C. § 1106. The Court earlier concluded that the assets of a pension fund were not being sold in any manner and neither the assets nor the liabilities of the National Steel pension fund were being transferred to the new company. The Court now finds that the terms of sale under consideration do not require a pension fund to conduct any transaction, prohibited or not prohibited, such as would implicate 29 U.S.C. § 1106.

It would appear that Congressional intent with regard to the more general fiduciary duties of 29 U.S.C. § 1104 also focused on activities affecting the fiscal assets of the plan. *See* H.R.Rep. No. 93–533, 93rd Cong., 2d Sess., ——, *reprinted in* 1974

U.S.Code Cong. & Ad.News, 4639, 4659; S.Rep. No. 93–127, 93rd Cong., 2d Sess., ——, ——, *reprinted in* 1974 U.S.Code Cong. & Ad.News, 4838, 4847 and 4864– 4865. However, some federal courts have expanded the expression of fiduciary duty beyond transactions involving pension fund assets. Without making a decision which would have precedential value in this jurisdiction, it is the opinion of the Court that this hearing on motion for summary judgment requires acceptance of a liberal view of fiduciary duties under § 1104 thus giving Plaintiffs' opposition to the motion the broadest possible consideration. The dichotomy between Congressional intent and judicial treatment aside, it is firmly established that the standard for review of fiduciary action when a § 1104 violation is alleged is whether the action is arbitrary and capricious. *See, e.g., Fentron Industries v. Nat. Shopmen Pension Fund,* 674 F.2d 1300, 1307 (9th Cir.1982). Therefore, a violation of § 1104 fiduciary standards must be based on a showing of bad faith or some other indicia of arbitrary and capricious action. *Id.* and *Schulist v. Blue Cross of Iowa,* 553 F.Supp. 248 (N.D.Ill.1982).

■ The Court's earlier finding that the proposed amendments to the pension agreement, inherent in the terms of sale, do not violate ERISA's vesting and non-forfeitability provisions precludes any contention that a fiduciary duty was breached on the basis that some pension "obligation" will be limited or forfeited if the terms of sale are approved. *Petrella v. NL Industries, supra,* 529 F.Supp. at 1366–1367. *Cf. Brug v. Pension of Carpenters, etc.,* 669 F.2d 570, 574– 576 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 135, 74 L.Ed.2d 116 (1982) (amending pension eligibility retroactively violates fiduciary duty on facts presented).

Beyond this, the remaining contentions are that a fiduciary duty may have been violated because avoiding prospective pension obligations motivated National Steel; that pension rights "earned" under employment with the new company may not be as secure as those "earned" under National Steel, and that National Steel has not acted solely in the interests of pension plan beneficiaries and participants.

■ The Court believes that ERISA cannot be perceived as requiring federal courts to weigh the potential success of one company as opposed to another when divestiture of a plant through sale to another entity is proposed. Plaintiffs' search for security of pension benefits to be earned in the future is something that is not contemplated by ERISA (beyond insuring certain minimal benefits protected by the Pension Benefit Guaranty Corporation).

Plaintiffs' contentions that fiduciary duties are violated because National was motivated to avoid prospective pension benefits, and that National has not acted solely in the interests of pension plan beneficiaries and participants suffer two fatal defects. First, embracing Plaintiffs' theory *in toto* would preclude *any* company offering pension benefits from amending the plan in such a way as to limit or eliminate provisions for benefits that are not vested or accrued. As stated before, such is not the state of the law.

■ Second, Plaintiffs' theory requires a view that *every* corporate decision arguably affecting pension benefits must be made solely in the interests of pension plan beneficiaries and participants. In the context of a decision which limits or eliminates prospective, conditional pension benefits, not required by the vesting and non-forfeitability provisions of ERISA, such is not the case.

■ The pension agreement specifies that National Steel is the plan administrator and trustee of the pension plan. A "dual loyalty" inherently exists when the employer (which is naturally interested in keeping its costs for pension benefits at a minimum) also acts as administrator or trustee of a pension plan. However, ERISA contemplates and approves of such an

arrangement in certain circumstances by providing that one may serve as a fiduciary in addition to being an officer, agent or other representative of an ·employer. 29 U.S.C. § 1108(c)(3). *See Donovan v. Bierwirth*, 538 F.Supp. 463, 468 (E.D.N.Y.1981), *aff'd as modified (on other grounds)*, 680 F.2d 263 (2nd Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). *Flinchbaugh v. Chicago Pneumatic Tool Co.*, 531 F.Supp. 110 (W.D.Pa.1982). When acting on behalf of the pension fund, there is no doubt that a fiduciary having such "dual loyalty" must act solely to benefit participants and beneficiaries. However, it is the Court's opinion here that when a corporate employer negotiates the terms of sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of future pension benefits (at least those that are not protected by ERISA's vesting and non-forfeitability provisions), do not implicate fiduciary duties as to the pension fund. Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund. In other words, the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior in negotiations concerning pension benefits not otherwise affected by the requirements of ERISA. *See N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 333 n. 16, 101 S.Ct. 2789, 2796 n. 16, 69 L.Ed.2d 672 (1981). When the terms of the pension agreement are negotiated by a labor organization and the employer and ultimately controlled by a collectively bargained agreement, as here, the distinction between administering the pension program (under a fiduciary duty) and creating or

amending the program through negotiations is even more clear. *See UMWA Health & Retirement Funds v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982).[2]

█ Even if a fiduciary duty were to be imposed on a corporate employer in such a situation, the Court would have to find that no duty was violated here. The Court earlier concluded that the proposed amendments do not deprive any Plaintiff of a vested or non-forfeitable benefit. The Court also concluded the amendments proposed are reasonable under the circumstances. Finally, the Court would conclude that since all employees of the Weirton Division (not just those covered by the pension agreement at issue) would be equally affected by the proposed changes, there is no discrimination. On the facts presented here, the action of National Steel in negotiating the terms of sale that affect ancillary pension benefits was neither arbitrary or capricious, nor has there been a showing of bad faith.

In conclusion, the Court finds that the terms of sale proposed to amend the 70/80 and rule of 65 retirement provisions of the pension agreement between National Steel and the Independent Steelworkers Union do not violate provisions of ERISA relating to vesting, accrued benefits, or non-forfeitability; do not violate provisions of ERISA relating to prohibited transactions; do not violate provisions of ERISA relating to fiduciary duties imposed upon National Steel or the pension plan, and do not violate provisions of the existing pension or collective bargaining agreements. The Court earlier found that the terms of sale do not violate other provisions of labor law.

SEVERANCE PAY ISSUES

The current collective bargaining agreement between National Steel Corporation,

**2.** As earlier mentioned, the corporate pension agreement specifies that the pension plan is administered by a committee of designated National employees and that most of the assets of the plan are held by a trust fund, managed and held by a separate entity. It has occurred to the Court that since the people actually administering the pension fund may not be at all

involved in the negotiations for the sale of the Weirton Division, no breach of fiduciary duty under 29 U.S.C. § 1104 would arise because of a division of labor within the corporation. However, the issues before the Court were framed to test National's participation in the events surrounding the proposed sale as a corporate entity.

Weirton Steel Division, and Defendant Union and its members who are production, maintenance, and hourly-rated plant clerical employees includes a provision for severance pay. In brief, a severance allowance is payable to employees who have accumulated three or more years of service when the company permanently closes a department or substantial portion thereof and the employment of individuals is terminated, either directly or indirectly, as a result of the department closure. There are exceptions to the severance allowance if the employee accepts an offer of a job in another department or is offered a job of the same job class in the same department or requests a lower job class job in the same department, etc. Payment of severance benefits in certain circumstances may affect other benefits from the company. (E.g., Payment of severance allowance may be deducted from pension benefits.)

In the *Brunner* complaint, it is alleged that the agreement that the sale of Weirton Division to a newly-formed, employee-owned corporation will not trigger Defendant National Steel's obligation to make severance payments to employees is either a breach of Defendant Union's fiduciary obligations or duty of fair representation. (Complaint §§ 44, 45, 46.) The amended complaint in the *Sutton* matter does not mention severance pay until the prayer for relief. It is therefore difficult, perhaps impossible, to determine the basis for challenge in that civil action. Based upon the pleadings, the motion for summary judgment under consideration, and other matters of record, the severance pay issue may be properly stated as follows: Whether a sale by an existing employer to another employer, without more, should trigger an obligation of the existing employer to pay severance benefits. Since both the *Brunner* and *Sutton* complaints state rather sweeping allegations of violations of ERISA, the Court will consider the issue both as to ERISA and the labor law duties of unions.

In general, a severance allowance is payment by an employer to an employee on termination of the employee's employment. Black's Law Dictionary, 1232 (5th ed. 1979). Such payment is beyond wages and is usually designed to ease the employee's financial burdens while looking for a new job. *See Owens v. Press Publishing Co.,* 20 N.J. 537, 120 A.2d 442 (1956).

Though not a retirement benefit, severance pay does come within the reach of ERISA as an "employee welfare benefit plan." 29 U.S.C. §§ 1002(1) (citing 29 U.S.C. § 186 and the benefits described therein), 1002(2)(B). Though the "vesting" provisions of ERISA (which mainly apply to pension plans) do not apply, other protective provisions of ERISA do apply, such as the safeguards against discrimination, 29 U.S.C. § 1140, and violation of fiduciary duties, 29 U.S.C. § 1104. *Calhoun v. Flastaff Brewing Co.,* 478 F.Supp. 357 (E.D.Mo. 1979). Federal courts frequently look to the contract language of severance pay benefits as a guide in determining whether violations have occurred. *See, e.g., Donnelly v. Aetna Life Ins. Co.,* 465 F.Supp. 696 (E.D.Pa.1979).

Unlike some severance pay provisions in collective bargaining agreements, the one at issue here does not set forth a purpose. Instead, Article XIV of the collective bargaining agreement merely sets forth conditions, eligibility, methods of determining the allowance, and other administrative provisions. However, one can easily determine that the benefit is designed to aid those whose employment is terminated.

■ Both the *Brunner* and *Sutton* actions challenge the proposed terms of sale between National Steel and a new employee-owned corporation. Thus the issue here is limited to whether the sale, without more, should trigger severance benefits. The Court is satisfied that the proposal to amend the severance benefit provisions of the collective bargaining agreement to preclude payment of severance allowances solely on the basis of the transfer of ownership violates neither ERISA nor the terms of the

agreement as currently written. Simply put, the fundamental bases for this benefit are not necessarily put into play by such a transfer; namely, the permanent closure of a department or substantial portion thereof, and the termination of employment as a direct or indirect result.

The testimony adduced at hearings thus far and several of the documents submitted as exhibits lead the Court to believe that all, or a substantial majority of all, the active employees of National's Weirton Steel Division will be offered an opportunity to go to work for the proposed employee-owned company. It can be said with certainty that any employee of National Steel who becomes employed by the new employer following the transition of ownership is not entitled to a severance allowance under the contract or under ERISA. *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361 (N.D. Ill.1979), *aff'd,* 618 F.2d 110 (7th Cir.1980) (table). Also, the agreement in principle containing the terms of sale from National Steel states that National will remain liable for outstanding and unrevealed severance pay claims. To say that any present employee of National at Weirton, either active or on layoff, will have a valid severance allowance claim that will be denied is purely speculative and it cannot be said that the existing Plaintiffs in *Sutton* and *Brunner* would be proper parties to such claims.

In large measure, the reasoning of the Court with regard to prohibited transactions and other fiduciary duties of National Steel under ERISA for pension benefit issues apply equally to severance pay issues. Because no activity affecting the fiscal assets of a welfare benefit plan is implicated with the proposed amendments to severance allowance provisions in the agreement, 29 U.S.C. § 1106 (prohibited transactions) cannot apply. Indeed, the funding requirements of ERISA do not even apply to employee welfare benefits plans such as a severance pay benefit, 29 U.S.C. § 1081, and there is no "fund" or group of assets subject to the prohibited transaction provisions.

Because severance pay benefits are not subject to ERISA's vesting and non-forfeitability requirements, there can be no breach of fiduciary duty on the part of any party for proposing a limit to such benefits on the basis that some "vested" right is curtailed. The distinction between a corporate fiduciary duty when administering a benefit plan and corporate activities in connection with negotiating changes in a benefit plan which were enunciated with regard to pension issues is applicable to this discussion of severance pay benefits. Therefore, there has been no violation of an ERISA-based fiduciary duty with regard to the proposed severance pay amendment.

In conclusion, the Court finds that the terms of sale proposed to amend the severance allowance provisions of the collective bargaining agreement between National Steel and the Independent Steelworkers Union do not violate provisions of ERISA relating to vested, accrued benefits or non-forfeitability; do not violate provisions of ERISA relating to prohibited transactions; do not violate provisions of ERISA relating to fiduciary duties, and do not violate provisions of the existing collective bargaining agreement. The Court earlier found that the terms of sale do not violate other provisions of labor law.

## THE MOTION TO DELAY CONSIDERATION

Counsel for Plaintiffs in these cases have filed a motion to delay consideration of National's motion for (partial) summary judgment until further discovery is completed.

Because the ruling of the Court is limited to issues surrounding the agreement in principle, as amended, which announced the terms of sale between National and a proposed company; and because the Court, for purposes of this Opinion and Order, has considered Plaintiffs' characterization of National's motivation for sale of the Weirton Division as true, there is no need to delay a ruling on the issues as framed. Therefore, Plaintiffs' motion will be denied in part.

**1204**

There are other issues raised by the complaints not reached herein. These include claims that additional pension supplements have been given to certain employees upon demand, but denied to Plaintiffs (*Sutton* complaint § 190), that Defendant Independent Steelworkers Union has acted through unlawfully elected officers (*Sutton* complaint § 210), and the earlier mentioned claims embodied in charges of unfair labor practices pending before the NLRB. As to the remaining issues, further discovery may be necessary. Provided the discovery is accomplished within the framework established by the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiffs' motion will be granted in part.

ORDER

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. Upon the reasoning and conclusions herein, it is

ORDERED that the motion of Defendant National Steel Corporation for partial summary judgment on the issues earlier delineated is GRANTED. It is further

ORDERED that the motion of Plaintiffs' to delay consideration of National's motion for summary judgment is DENIED in part, and GRANTED in part, as earlier delineated.

Additionally, there are many other issues raised and suggested by the complaints in *Brunner* and *Sutton* which are not resolved to date. The Court will look to counsel for the various parties to begin proceedings which will mature these matters for speedy disposition.