UNITED INDEPENDENT FLIGHT
OFFICERS, INC., et al.,
Plaintiffs-Appellants,

v.

UNITED AIR LINES, INC., and Air
Line Pilots Association,
International, Defendants-Appellees.

No. 83–3069.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1984.

Decided Jan. 17, 1985.

Raymond C. Fay, Haley, Bader & Potts, Chicago, Ill., for plaintiffs-appellants.

Columbus R. Gangemi, Jr., Winston & Strawn, Chicago, Ill., Michael E. Abram, Cohen, Weiss & Simon, New York City, for defendants-appellees.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is the second appeal heard by this panel arising out of various disputes between United Independent Flight Officers, Inc. ("UIFO"), United Air Lines, Inc. ("United"), and the Air Line Pilots Association, International ("ALPA"). Plaintiff UIFO is a corporation whose members include current and former United flight deck crew members (i.e. pilots, co-pilots and navigators—collectively, "pilots"). Defendant ALPA is the collective bargaining representative of the pilots of United and so of members of UIFO. The ten individual plaintiffs are members of UIFO and current or retired pilots for United.[1]

This case is a challenge to the terms of, and amendments to, one of United's pilot benefit plans, and the negotiations leading to those terms and amendments. The plan in issue is the United Air Lines, Inc., Pilots' Fixed Benefit Retirement Income Plan, also known as the A Plan. The Fixed Benefit Plan was created in 1941 and substantially modified in 1965 and 1972, and was also amended at other times, including 1977, 1979 and 1981. Plaintiffs claim that as a result of these changes they were disparately treated in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, and the Railway Labor Act (the "RLA"), 45 U.S.C. § 151 *et seq.*, as made applicable to air carriers by 45 U.S.C. § 181. Plaintiffs appeal the district court's grant of summary judgment for defendants on Count I of the complaint, which alleges a breach of fiduciary duty under section 404 of ERISA, 29 U.S.C. § 1104, and Count IV, which alleges a breach of

---

**1.** Three of the individual plaintiffs here are also plaintiffs in *United Independent Flight Officers,* *Inc. v. United Air Lines, Inc.,* 756 F.2d 1262 (7th Cir.1985) *("UIFO–1").*

the duty of fair representation implied under the RLA. Plaintiffs also appeal the district court's denial of class certification and of their post-judgment motion to add parties plaintiff. The district court's order is reported at 572 F.Supp. 1494 (N.D.Ill. 1983). We affirm.

## I.

In order to understand the nature of this dispute, it is necessary to begin in 1941 when United created a voluntary fixed benefit plan for its pilot employees. All employees were eligible to participate in the plan, but in order to participate an employee had to contribute a certain amount annually from his take-home pay. If an employee participated, United contributed the additional funds necessary to fund the plan's benefit obligations. If the employee did not contribute, neither did United. Retirement benefits were accrued only for those periods during which the employee participated. Apparently many pilots participated at some time during this period, but few participated for the entire period of their eligibility.

In 1965 the first of the several changes which resulted in the disparities of which plaintiffs complain took place. The pilots' fixed plan became currently funded entirely by United, and participation was determined by years worked (less the first probationary year). These changes were prospective, so that after 1965 all pilots were participants in the plan, but none had to contribute to it. Pilots with pre-1965 periods of non-participation were not given participation credit for those earlier years. Contributions of pilots who had participated prior to 1965 were not refunded, but their participation credit was continued.

The second major revision of the fixed benefit plan took place in 1972. The basis for benefit calculation was changed from career average earnings to final average earnings, based on an average of the five consecutive years with the highest total earnings of a pilot's final ten years of employment. The point of this change was to more closely match pension benefits to the cost of living at time of retirement, which could be done by tying benefit levels to later, and presumably higher-paying, years. The benefit accrual formula adopted was 1.2% times final average earnings using the highest consecutive five years of a pilot's last ten years of employment times years of participation (1.2% × FAE(5) × years of participation). Once again, pre-1965 pilot contributions were not refunded and pilots were not given participation credit for all pre-1965 years of eligibility whether or not they had contributed. The participation credit for those pilots who had contributed prior to 1965 was, of course, continued.

In 1976 the plan was amended to comply with the then recently enacted ERISA. Plaintiffs assert that these changes "were so extensive as to warrant the conclusion that the plan which is the subject of this action did not actually exist in its present form until this redrafting process was completed." UIFO Br. 4. Apparently they intend us to conclude that the post-1976 plan is a different arrangement rather than a modified continuation of a previously existing arrangement. However, all their assertion really entails is that changes were made. In addition, the multiplier was raised from 1.2% to 1.25% in 1977 and further increased to 1.3% in 1979.

In early 1981 the 1979 agreement between United and ALPA governing the terms and conditions of employment of United pilots was set to expire. On March 20, 1981, negotiations for a successor labor agreement had not been completed, so United and ALPA agreed to extend the 1979 agreement with certain immediate wage improvements, and agreed to continue negotiations. United and ALPA also agreed that any improvements to the United pilot pension or disability plans resulting from these continuing negotiations would be made retroactive to February 1, 1981. Negotiations continued and the new "Basic Agreement" covering wage and work issues was signed on August 14, 1981. However, agreement had not been reached on any pension improvements, so the parties agreed to continue negotiating and that any improvements would be retroactive.

In addition, the parties agreed that if no agreement could be reached on the pension issues by August 1, 1982, the 1981 Basic Agreement would be subject to reopening.

Continued negotiations were successful, and on June 24, 1982, a "Supplemental Agreement" was signed. The Supplemental Agreement modified and improved the fixed benefit plan by increasing the multiplier from 1.30% to 1.39% and basing the final average earnings calculation on the income of the pilot's three consecutive years with highest income out of his or her final ten years of employment rather than on the income of five such years. The effect of these changes was to increase the benefit payable to the pilot. However, since the change increased the value of a year of participation in the plan, it also increased the absolute—though not the relative—difference in retirement benefits between pilots who had participated in the plan for different periods of time. Once again, pre-1965 contributions were not returned and pilots were not given credit for voluntary non-participation prior to 1965.

Of central importance in this case is the manner in which the issue of contribution return and non-participation service credit ("CR/NPSC") was raised among the pilots and within ALPA, and dealt with in negotiations between ALPA and United. Although there had been some dissatisfaction with the terms of the plans, the dispute over CR/NPSC did not heat up until the spring of 1979. At that time the unionized ground crews struck and obtained CR/NPSC modifications to their pension plans. United subsequently granted CR/NPSC to non-unionized ground crew employees to keep their plan competitive with that of the unionized ground crews, but at the same time dissolved the non-union variable plan and rolled its assets into the non-union fixed plan. At a June 1, 1979, negotiating meeting with United concerning the 1979–81 contract, ALPA proposed CR/NPSC, but ALPA's formal contract proposal presented on June 7th did not mention the issue. Thus CR/NPSC was not pursued in the 1979 negotiations, and the 1979 collective bargaining agreement did not obtain CR/NPSC. Sometime in 1979 United's actuary estimated the cost of CR/NPSC for the pilots at $36 million.

Also in 1979, ALPA's pension consultant considered the possibility of CR/NPSC. In a letter to ALPA, he recommended that the pilots consider and bargain to obtain CR/NPSC, because the ground crew unions had obtained it. His letter also recognized and explained certain inequities which would result from obtaining CR/NPSC. Supp.App. Item 5, R. 216, Brand Ex. 6.

In January of 1980 a petition was circulated among the pilots of United which requested that the Management Executive Committee of ALPA (the "MEC") obtain CR/NPSC from United. The petition did not mention what the signers would be willing to trade off to get CR/NPSC. The petition was signed by 946 of United's 5806 pilot employees, and was presented to the MEC. The MEC voted to approach United about CR/NPSC before the next negotiations, and did so. United refused to consider CR/NPSC except as part of the next regular negotiations, scheduled for early 1981. United did contact its actuary, who determined the change in unfunded liability which would be created by the proposal. The figure, $70 million or $4.6 million for each of 30 years, was larger than the actuary's 1979 estimate, and was passed on to ALPA.

During the summer of 1980 UIFO was formed. In November of that year ALPA presented United with an opening list of contract improvements it hoped to obtain in the upcoming negotiations over the 1981 collective bargaining agreement. Included as item 12 (of 13) in the list of benefit improvements was CR/NPSC, although ALPA wanted participation credit for furlough time as well as for pre-1965 voluntary non-participation. In February, 1981, the MEC resolved to make CR/NPSC its "highest priority" among benefit issues in the current negotiations. The "directive" to this effect was, according to UIFO, countermanded by the MEC officers and negotiating committee. UIFO Br. 7. There is no dispute that at this time any

consensus which had existed with respect to CR/NPSC began to fall apart. Nor is there any dispute that the CR/NPSC proposal was placed "on the back burner" by the ALPA negotiators. Following the procedures of previous negotiations, they concentrated on wage and work issues and put off consideration of pensions until those were settled.

In May, 1981, the MEC met in Seattle. At this time it voted to request United to change the assumption rates of the plan, on which were based United's levels of contribution and unfunded liability for the fixed benefit levels. (United refused, but some time later did change the assumption rates.) The MEC also developed the "Seattle Plan," which dropped the CR/NPSC proposal. Instead, the Seattle Plan proposed benefits be paid on a years of service basis, with a minimum benefit (60% of FAE) for pilots with 25 or more years of service. The plan also included an actuarial reduction for years of voluntary non-participation in years prior to 1965 and a buy-back provision for non-participating pilots (which would allow pilots who in years prior to 1955 had been unable to participate because they were younger than 25 to get participation credit for those years). This Seattle plan was adopted by the MEC by a vote of 25-1, but rejected by United as too costly.

In June, 1981, United made its counter-proposal. Under this proposal the B plan would be dissolved and its assets rolled into the A plan. The A plan was to be improved by raising the multiplier to 2.72, but keeping FAE(5) and years of participation as the other two factors. The proposal also included a minimum benefit of 68% of FAE for pilots with 25 or more years service, and placed a cap (at 25) on the number of years of participation that would be counted in the formula. This proposal would have benefited all pilots, including plaintiffs, and supposedly would have virtually equalized benefit levels of pilots with comparable FAE's. It was deemed satisfactory by the UIFO board, but rejected by ALPA, under pressure from younger pilots who feared that due to furloughs they would not have enough seniority to reach the higher paying equipment and that they would be hurt by folding the B plan into the A plan.

Later in the year United and ALPA succeeded in reaching and signing a new Basic Agreement. They also agreed to continue negotiating on pension matters, and United agreed to grant benefit improvements costing up to $70 million in unfunded liability.

The MEC adopted another plan, the "Honolulu Plan," in October of 1981. This proposal dropped CR/NPSC, and instead aimed for an increase in the multiplier and a shortening of the years used to calculate FAE, and to prevent abolition of the B plan. The idea was to get the highest possible increase for the older pilots without any significant decrease for the younger pilots, who opposed any decrease in the B plan.

Eventually a compromise was worked out by United and ALPA. United's defined contributions to the B plan were decreased from 11% to 9% of a pilot's earnings. The formula for the defined benefit of the A plan was increased—by changing the multiplier from 1.30% to 1.39% and by calculating the FAE on the basis of three rather than five years. Although not required to do so, the MEC submitted the Supplemental Agreement to the members of ALPA for approval. The agreement was approved by 68% of the members who voted. The vote was 1,423 approving, 671 rejecting, out of 4,112 ballots mailed and 2,094 returned. The MEC then ratified the Supplemental Agreement. Shortly before the Supplemental Agreement was signed the plaintiffs commenced this action, and shortly afterward United changed its assumption rates. However, the plan assumption rates are apparently still quite conservative by industry standards.

As indicated, the complaint is framed in four counts, two under ERISA, one under the ADEA and one under the RLA. An additional 231 plaintiffs "opted in" to the ADEA claim pursuant to the provisions of 29 U.S.C. §§ 216(b) & 626(b). In its Memo-

randum Opinion and Order, 572 F.Supp. 1494 (N.D.Ill.1983), the district court granted summary judgment for defendants on all four counts of the complaint. The district court also denied plaintiffs' motion for class certification. Plaintiffs later filed a post-judgment motion requesting that all 231 opt-in plaintiffs of the ADEA count be added to all counts as plaintiffs and that the judgment then be made final as to them. The district court denied this motion without explanation. Plaintiffs now appeal the district court's grant of summary judgment on the first and fourth counts. Count I claims breaches of fiduciary duty under section 404 of ERISA, 29 U.S.C. § 1104; Count IV alleges violations by both defendants of ALPA's duty of fair representation ("DFR") implied under the RLA, 45 U.S.C. § 151 *et seq.* Plaintiffs also appeal the denial of class certification and of their post-judgment motion to add parties plaintiff.

### II.

The first issue we consider is the grant of summary judgment for defendants on plaintiffs' claim that the defendants breached the fiduciary duties imposed on them by section 404 of ERISA, 29 U.S.C. § 1104. UIFO alleges, in essence, that United and ALPA breached their fiduciary duties by failing to amend the plan to secure CR/NPSC and by increasing the absolute benefits available under the plan (thereby increasing the relative disparities). The district court granted summary judgment for defendants on the grounds, among others, that ALPA was not a fiduciary under ERISA and that United did not violate any fiduciary duty it had by failing to return the pre-1965 contributions or by implementing the changes in the benefit calculation formula.

Neither ALPA nor United could have breached its fiduciary duty unless it had such a duty. Neither could have such a duty, of course, unless it was a fiduciary

**2.** Subparagraph (B) deals with the fiduciary status of registered investment companies. Section 1105(c)(1)(B) deals with persons appointed

under the terms of ERISA. The duties of a fiduciary are set out in section 404 of ERISA but section 3(21) of ERISA actually defines a fiduciary. In relevant part, section 3(21) provides:

> (A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under Section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21).[2]

There is no contention that either ALPA or United rendered investment advice for compensation nor, since the plans in question are employer-administered, that ALPA has any discretionary authority or responsibility in administering the plan. Therefore ALPA could only be a fiduciary to the extent it exercises any discretionary authority or control respecting management of the plan or over management or disposition of its assets. Similarly, United could only be a fiduciary to the extent it exercises any discretionary authority or control respecting management of the plan or over management or disposition of its assets, or has discretionary authority or responsibility in the administration of the plan. ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A); 29 CFR § 2509.75–8; *Thornton v. Evans*, 692 F.2d 1064, 1077 (7th Cir.1982); *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 259 (7th Cir.1983).

by named fiduciaries to carry out fiduciary responsibilities.

ALPA's status as a fiduciary, based on authority or control over the plan or management or disposition of its assets, cannot extend beyond the signing of the Supplemental Agreement. *See Rosen v. Hotel & Restaurant Employees Union, Local 274,* 637 F.2d 592 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Therefore ALPA's fiduciary status could only rest on its authority or control over the plan through collective bargaining with United, in particular through the negotiations leading up to the 1982 Supplemental Agreement, or through its control over the management or disposition of the plan assets prior to that time.

■ In *United Independent Flight Officers, Inc. v. United Air Lines, Inc.,* 756 F.2d 1262 (7th Cir.1985) (*"UIFO-1"*), we considered whether a union or an employer had fiduciary status during negotiations over the terms of future pension benefits controlled by a collective bargaining agreement. In light of the conflicting duties imposed on negotiators and fiduciaries, *see NLRB v. Amax Coal Co.,* 453 U.S. 322, 336, 101 S.Ct. 2789, 2797, 69 L.Ed.2d 672 (1981), we held that neither a union nor an employer is an ERISA "fiduciary while, or merely because, it is negotiating the terms and conditions of future pension benefits, at least where these benefits are not protected under ERISA's vesting and nonforfeitability provisions." *UIFO-1,* at 1268. *See Sutton v. Weirton Steel Division of National Steel Corp.,* 567 F.Supp. 1184 (N.D.W.Va.), *aff'd,* 724 F.2d 406 (4th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). *See also Rosen v. Hotel & Restaurant Employees Union, Local 274,* 637 F.2d 592 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Thus neither ALPA nor United was a fiduciary as they negotiated the benefit changes, including consideration of the CR/NPSC proposals, incorporated into the 1982 Supplemental Agreement.

■ UIFO contends that when, at the time of the signing of the Basic Agreement, United agreed to adopt pension improvements representing $70 million in unfunded liability, that commitment (or the $70 million UIFO says it represented; UIFO is not always clear about which it is referring to) is an asset of the plan. Since United had committed that much to the plan, and was at one time willing to consider CR/NPSC, UIFO concludes that ALPA had management or administrative control over a plan asset, and hence was a fiduciary. We disagree. A bargaining commitment is not a plan asset, and hence ALPA was not a fiduciary on that basis. *See Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406, 411–12 (4th Cir.1983) (neither employer's unfunded liability for contingent benefits nor corporate treasury where employer has unfunded liability for contingent benefits was asset of plan within meaning of ERISA), *cert. denied,* — U.S. —, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

United is not a fiduciary because of its status as a negotiator over the terms of the plan, but it is administrator of the plan, and hence a fiduciary to that extent. As administrator, United could not have breached any fiduciary duties with respect to the terms of the plan until those terms were incorporated into the plan at the conclusion of negotiations. But return of contribution and non-participation service credit were never included in the terms of the plan. Under the terms of the plan, prior to and as amended by the Supplemental Agreement, contributions were not to be returned and credit was not to be given for years of non-participation. The changes in the benefit calculation formula, which increased the fixed benefit payable to pensioners, were incorporated in the plan and complied with by United. United breached no fiduciary duty in administering the plans in accordance with the terms of the Supplemental Agreement. *UIFO-1,* at 1269; *UMWA Health & Retirement Funds v. Robinson,* 455 U.S. 562 at 574, 102 S.Ct. 1226 at 1233, 71 L.Ed.2d 419 (1982).

We conclude that there is no set of facts which UIFO can prove to support its claim that either United or ALPA has breached

its fiduciary duties under ERISA. Summary judgment was properly granted on Count I.

## III.

Count IV of plaintiffs' complaint asserts that ALPA breached its duty of fair representation (its "DFR") implied under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, as applied to air carriers by 45 U.S.C. § 181, and that United was a party to that breach. UIFO alleges that ALPA

> acted arbitrarily and capriciously by (1) the misrepresentation of and failure to disclose its collective bargaining position concerning (a) amending the plan to credit pilots for years before 1965 in which they did not make voluntary contributions, and (b) the return of such voluntary contributions, and (2) the negotiation and implementation of the years of participation formula.

District Court Memorandum Opinion and Order, 572 F.Supp. at 1507. The district court granted summary judgment for defendants. UIFO appeals, arguing that the district court applied the wrong legal standard and impermissibly weighed the evidence.

### A.

Employees have a cause of action against their unions for breach of the union's duty of fair representation. Both the union's duty and the employee's cause of action are "implied under the scheme of the National Labor Relations Act," *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); *Ranieri v. United Transportation Union*, 743 F.2d 598, 600 (7th Cir.1984). A similar duty and cause of action are implied under the Railway Labor Act, *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 204, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944); *Ranieri*, 743 F.2d at 600, which is applicable to airlines, 45 U.S.C. § 181.

The duty of fair representation requires a union to serve the interests of all its members without hostility or discrimination, to exercise its discretion with good faith and honesty, and to eschew arbitrary conduct. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The duty to fairly represent its members extends both to the negotiation and to the administration of the collective bargaining agreement, though the standards applied in the two contexts may be somewhat different. *Schultz v. Owens-Illinois, Inc.*, 696 F.2d 505, 514 (7th Cir.1982).

The process of negotiation is one of "compromise and economic pressure," *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336, 101 S.Ct. 2789, 2797, 69 L.Ed.2d 672 (1981). The union and employer "attempt to reach an agreement by negotiation, and, failing agreement, are free to settle their differences by resort to such economic weapons as strikes and lockouts, without any compulsion to reach agreement." *Id.* Nor is there any compulsion to reach a particular agreement. Of course the substantive terms of the agreement must comply with federal law, *UMWA Health & Retirement Funds v. Robinson*, 455 U.S. 562, 575, 102 S.Ct. 1226, 1234, 71 L.Ed.2d 419 (1982), and the bargaining process must comply with the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, or the RLA. In the process the union must fairly represent the interests of all employees in the bargaining unit. *Robinson*, 455 U.S. at 576, 102 S.Ct. at 1234. But just as the union may compromise with the employer, it must mediate among the various interests of its employees.

> A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. ... The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. ... Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is

hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in servicing the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). This discretion to mediate and compromise, so long as it is pursued in good faith and with honesty, certainly extends to bargaining over the terms of employee benefit plans. *Robinson,* 455 U.S. at 573–76, 102 S.Ct. at 1232–34.

■ It is now settled law that, at least in this circuit, a union does not breach its DFR unless it "intentionally caus[es] harm to an employee," *Hoffman v. Lonza, Inc.,* 658 F.2d 519, 522 (7th Cir.1981). *Dober v. Roadway Express, Inc.,* 707 F.2d 292, 294 (7th Cir.1983); *Superczynski v. P.T.O. Services, Inc.,* 706 F.2d 200, 202–03 (7th Cir. 1983). *Cf. Hoffman,* 658 F.2d at 523–25 (Cudahy, J., concurring). *Hoffman* imposes a standard under which there must be deliberate or intentional misconduct on the part of the union before it has breached its DFR. *Superczynski,* 706 F.2d at 202–03; *Graf v. Elgin, Joliet & Eastern Railway Co.,* 697 F.2d 771, 777–81 (7th Cir.1983). This duty "is not breached, and the employee has no remedy without substantial evidence of fraud, deceitful action or dishonest conduct." *Hoffman,* 658 F.2d at 522.

Because of the longstanding objective of federal labor law to minimize judicial intervention in labor disputes normally resolved by arbitration, and because of the fact that arbitration is available under the Railway Labor Act, a standard at least as strict as the *Hoffman* standard applies in cases of claimed breaches of RLA-based DFRs. *Graf,* 697 F.2d at 780. (*Hoffman* involved an NLRA-based DFR.) Similarly, because of the "wide range of reasonableness" within which a union may resolve conflicts during negotiations, *Ford Motor Co. v. Huffman,* 345 U.S. at 338, 73 S.Ct. at 686, a standard at least as strict as the *Hoffman* standard applies in cases of claimed breaches of DFRs during negotiations.

*Schultz v. Owens-Illinois, Inc.,* 696 F.2d 505, 514–16 (7th Cir.1982). (*Hoffman* involved a union grievance proceeding.) This circuit has applied the standard of *Ford Motor Co. v. Huffman* in examining the conduct of unions during negotiations where it was claimed the union had breached its DFR. *Schultz,* 696 F.2d at 514–15; *Alvey v. General Electric Co.,* 622 F.2d 1279, 1289 (7th Cir.1980).

The principal factual issue in the dispute before us is "whether ALPA leadership acted hostilely and invidiously against plaintiffs' interests to orchestrate the demise of the February 1981 resolution." UIFO Reply Br. 15. There is no dispute that the February, 1981, resolution, which called for CR/NPSC including furlough credit, was "put on the back burner" and dropped. But UIFO fails to mention that *all* pension issues were put on the back burner during negotiations until the new Basic Agreement was reached. This was in accord with the practice of prior years' negotiations. Nor does UIFO mention that it was the full MEC, not the ALPA leadership, which adopted the Seattle plan and then the Honolulu plan. There is no dispute in the record that the MEC's position was based on the desire to secure the greatest good for the greatest number, and that the MEC goal after United rejected the Seattle plan was to secure the best possible pension benefits for the then retiring pilots without reducing the projected benefits of the younger pilots. Indeed, plaintiff Plank admitted as much in his deposition testimony, and even recognized that the B plan was reduced over the opposition of the younger pilots. Plank Dep. 349; ALPA Br. 34. *See also* Norwood Dep. 61–62. Plaintiff Norwood testified that he had no reason to believe that the chairman of the ALPA negotiating committee had not in his own mind tried to divide the available pension money as equitably as he could. Norwood Dep. 51; ALPA Br. 35. Indeed, the testimony of Wilsman, upon which UIFO principally relies in its attempt to show a dispute over material facts, does not support its claim that its members were the victims of arbitrary, hostile or bad faith

conduct on the part of ALPA. Rather, the evidence points to a bitter, but rather typical, dispute in which compromises were made between the conflicting interests and favored proposals of the several subgroups of the bargaining unit. Even Plank was "sure there was much give and take in the negotiating process." Plank Dep. 349.

■ Plaintiffs have not presented "substantial evidence of fraud, deceitful action or dishonest conduct," *Hoffman*, 658 F.2d at 522, on the part of the ALPA leadership. Under the standard of *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983), plaintiffs have no issue for trial.

#### B.

■ UIFO also claims that United is liable to it as a party to ALPA's supposed DFR breach. UIFO does not bring a direct claim against United under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, as is usually the case in what have come to be known as "hybrid DFR/301" cases, *see, e.g., DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). In the usual hybrid case the 301 claim against the employer could conceptually stand distinct from the DFR claim against the union, but UIFO cannot bring such a claim because section 301 does not apply to employers, such as United, subject to the Railway Labor Act, 45 U.S.C. § 152(2) & (3). Thus the claim here is that United is a party to ALPA's breach. We first note the conceptual anomaly that would arise if United were held liable as a party where ALPA, the principal, had been held not to have violated its duty. If the RLA-based DFR claim against the union is dismissed, the claim against the employer must also be dismissed. *Graf,* 697 F.2d at 781.

■ An employer is liable together with the union for the union's breach of its DFR if it acts in collusion with the union. *See e.g., Alvey v. General Electric Co.,* 622 F.2d 1279, 1290 (7th Cir.1980). United bar-

gained, as it was required to do, with ALPA. UIFO argues, however, that this interaction with ALPA in negotiating and signing the Supplemental Agreement was the requisite collusion. "By the very nature of collective bargaining, the exacerbation of the non-participation penalty in post-ERISA contracts was a joint enterprise of United and ALPA." UIFO Br. 31 n. 12. Therefore, we are told, summary judgment that United and ALPA did not collude was improper. We do not attribute to UIFO the patently fallacious argument that negotiation necessarily entails collusion, but we find equally invalid the argument that simply because it is undisputed that United and ALPA negotiated, summary judgment that they did not collude is improper. UIFO directs us to no evidence supporting their assertion of collusion, and the district court found no factual basis on which to infer the existence of such collusion. Summary judgment for United on Count IV was proper.

#### IV.

■ The final two issues on appeal concern the district court's denial of UIFO's motion for class certification and its denial of UIFO's post-judgment motion for leave to add parties plaintiff and to amend the judgment accordingly. Both of these actions are to be reviewed on an abuse of discretion standard. *Evans v. City of Chicago,* 689 F.2d 1286, 1292 (7th Cir.1982) (class certification); *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir. 1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981) (class certification); *U.S. Labor Party v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980) (post-judgment amendment motion).

■ The district court has broad discretion under Rule 23, FED.R.CIV.P., in determining whether a class should be certified. *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1129 n. 38 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). The district court found that the proposed class

met the first three requirements of Rule 23(a)—the proposed class was so numerous joinder was impracticable, there were questions of law or fact common to the class, and the claims or defenses of the representative parties were typical of the claims or defenses of the class—but failed to satisfy the fourth. The court determined that UIFO had not satisfied its burden of showing that the representative parties would fairly and adequately protect the interests of the class. *See Valentino v. Howlett,* 528 F.2d 975, 978 (7th Cir.1976) (plaintiff bears burden of showing each Rule 23 requirement satisfied by proposed class).

The district court identified a number of possible conflicts between the named plaintiffs and other members of the proposed class. First, the named plaintiffs belong to UIFO, which, in the understatement of the district court, "is at least somewhat antagonistic to ALPA, the collective bargaining representative of United pilots, members of the putative class." 572 F.Supp. at 1500. At least some class members oppose the benefit changes for which plaintiffs sue. Further, the plaintiffs seek certification of two subclasses: subclass 1 includes those who have some period of voluntary nonparticipation prior to 1965; subclass 2 includes those with some voluntary participation prior to 1965 and who have retired after 1975. Active pilots who contributed continuously prior to 1965 are excluded from both subclasses.

> Pilots with the greatest stake in an award of past service credit, members of subclass 1, voluntarily contributed the least to the pre-1965 pension plan; while pilots with a major stake in the return of contributions, those in subclass 2, contributed the most and may not oppose the present plan formula to the same extent.

572 F.Supp. at 1500. No named plaintiff is a member of subclass 2 alone. The district court concluded that the "differences among United pilots concerning their economic interests with regard to benefit plans represent a substantial conflict going to the subject matter of the litigation, thus rendering class certification inappropriate."

*Id.* We find no abuse of discretion in this conclusion. *See East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977) (overruling class certification in part because union, including class members, voted contrary to plaintiffs' position). *See also Carroll v. American Federation of Musicians,* 372 F.2d 155, 162 (2d Cir.1967) (class certification denied where action was challenge to union control but there was evidence many proposed class members satisfied with union policies), *vacated and remanded on other grounds,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968).

■ Finally, UIFO appeals the district court's denial of its post-judgment motion to add the 231 opt-in ADEA Count III plaintiffs as plaintiffs in the other counts. The motion was denied without explanation. While it would have been preferable for the court to note its reasoning, we do not feel it abused its discretion in denying the motion. Plaintiffs knew of the identity of the 231 long before judgment was entered, since they were plaintiffs in the ADEA count. Similarly, the 231 were aware of the litigation. There is no indication they were denied the opportunity to join the other counts earlier in the proceedings or that they wanted to do so. We do not believe the district court abused its discretion in denying post-judgment amendment where UIFO's decision to wait until after judgment was, presumably, strategic. *See United States Labor Party v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980).

UIFO's reliance on *Romasanta v. United Air Lines, Inc.,* 537 F.2d 915 (7th Cir. 1976), *aff'd sub nom. United Air Lines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), is misplaced. In *Romasanta,* a member of the proposed class requested leave to intervene pursuant to Rule 24(b), Fed.R.Civ.P., to prosecute an appeal from the denial of class certification. We reversed, holding it an abuse of discretion to deny intervention since none of the named plaintiffs were going to appeal the class certification denial. Here UIFO has appealed the denial of class certi-

fication and the interests of the members of the putative class in certification are represented on appeal. Nor is *Adams v. Gould, Inc.*, 739 F.2d 858 (3d Cir.1984) apposite. That case involved an amendment which would have asserted a new legal theory which had been raised and on the facts was legally sufficient. Here no new legal theory is suggested—UIFO desires simply to add more plaintiffs to this losing effort to move the controversies of the bargaining table into the courtroom.

### V.

For the reasons given above, we hold that the district court properly granted summary judgment for defendants United and ALPA on counts I and IV, and did not abuse its discretion in denying class certification and the post-judgment motion to amend the complaint to add parties plaintiff. The judgment of the district court is therefore AFFIRMED.